**QUAKER HILL PLACE, Appellant,**

v.

**STATE HUMAN RELATIONS COMMISSION and Raymond L. Saville, Jr., Appellees.**

Superior Court of Delaware, New Castle County.
Submitted: Aug. 7, 1985.
Decided: Aug. 13, 1985.

Richard R. Wier, Jr., Prickett, Jones, Elliott, Kristol & Schnee, Wilmington, for appellant.

Barbara R. Paul, Delaware Volunteer Legal Service, Wilmington, for appellees.

Brian J. Hartman, Community Legal Aid Soc., Inc., Wilmington, for Handicapped Advocacy Network of Delaware, Inc., amicus curiae.

MOORE, Justice (Sitting by Designation Pursuant to Del. Const. Art. IV, § 13.)

This appeal is from a decision of the State Human Relations Commission (the Commission) declaring that appellant, Quaker Hill Place, discriminated against appellee, Raymond Saville, Jr., in violation of 6 *Del.C.* § 4603(1). The charge is that Quaker Hill refused to rent Saville an apartment, allegedly because he suffered from a mental handicap.[1] Quaker Hill contends that the rejection was based on Saville's antisocial behavior unrelated to his alleged handicap. Thus, this Court addresses for the first time in Delaware certain issues bearing upon the alleged discrimination of mentally handicapped persons in seeking housing. These issues include:

1) The threshold jurisdictional requirement that there be a nexus between the tenant's mental handicap and any aberrant behavior upon which a landlord allegedly bases its rejection of the applicant;

2) The right of a landlord to impose reasonable eligibility qualifications upon a prospective tenant suffering a mental handicap; and

3) The parties' respective burdens of proof.

1. With certain exceptions Delaware law, independently of any federal statute, rule or regulation, prohibits discrimination in housing because of a tenant's handicap. Thus, 6 *Del.C.* § 4603 provides in pertinent part:

Except as provided in § 4604 of this title, it shall be an unlawful practice for any person, because of ... handicap ... of another person, to: (1) refuse to ... rent ... a dwelling offered to the public for ... rent.
6 *Del.C.* § 4603(1).
The relevant exceptions in 6 *Del.C.* § 4604 are that:

Based upon this record I must conclude that (1) it is devoid of substantial evidence to sustain a conclusion that Saville's aberrational behavior was a manifestation of his mental handicap, and thus Quaker Hill's rejection was impermissibly based on that disability; (2) a landlord may impose reasonable qualifications upon a prospective tenant suffering a mental handicap when those qualifications are rationally related to the applicant's financial responsibility, the safety of other tenants and their guests, and the safety of the landlord's property.

Under the circumstances the findings and conclusions of the Commission are reversed. The matter will be remanded to the Commission with directions that the record be reopened so that all relevant evidence bearing upon the relationship between Saville's mental handicap and any allegedly aberrational behavior may be fully explored.

I.

Saville has been diagnosed as suffering from "Bi-Polar Disorder, Mixed Type", an apparent form of manic depression, which the Commission assumed was the cause of Saville's occasional antisocial behavior.

In the summer of 1983 Saville applied for an apartment at Quaker Hill. On the application he indicated that he was mentally handicapped, citing the manic depressive condition. Apparently, this illness would entitle Saville to federal rent assistance in a private, federally subsidized housing

(c) The provisions of this chapter as to discrimination based upon handicap shall not require any person to modify the features or structure of a dwelling unless otherwise required by law or the following conditions are met:
(1) A minor modification of the dwelling is requested by a tenant or prospective tenant and the tenant or prospective tenant bears the expense of the modification;
(2) If requested by the landlord or owner, the tenant agrees in writing prior to the modifications to return the dwelling to its original state prior to vacating the dwelling.

project, like Quaker Hill, which provides apartments to the handicapped and elderly.

Despite excellent references, including a medical report that Saville could live in a socially responsible manner, Quaker Hill rejected the application. At the Commission hearing Quaker Hill relied upon several instances of unusual behavior by Saville, including certain criminal acts. These included:

(1) In 1981 Saville became angered over late delivery of his mail. His hostility toward the postal authorities was further exacerbated by an increase in first class postage rates. There were acrimonious discussions about the former with his local postmaster, who had advised that the delivery problems related to Saville's location on the mail route. In response Saville demanded that the delivery routes be changed so that he would receive his mail first. When this was not done, he twice went to his local post office and each time bought $100 worth of 20¢ stamps by check. On a third occasion he went to a different post office and did the same thing. In each case he promptly stopped payment on the checks, advising his bank either that he did not like the new postage rates or that he did not like his postmaster. He was charged with felony theft, which the State offered not to prosecute. Instead, Saville demanded trial, was convicted and ultimately served a short prison term. Saville admitted at the Commission hearing that he used "poor judgment" in declining the State's offer to drop the charges.

2) In 1979 Saville became angered over the gasoline crisis, which caused long lines at the pumps and restricted gas sales. He also was harboring animosity toward the Delaware State Police in connection with a prior arrest in 1975. Spotting the Governor's official automobile parked outside Legislative Hall in Dover, Saville decided to protest his grievances by letting the air out of the Governor's tires. After doing so, he later went to the Governor's office and gave the valve stems from the tires to a secretary. Although he was questioned by the State Police, no prosecution resulted.

3) In June, 1982, Saville was hungry and without money. Allegedly, because he wanted to get arrested in order to receive a free meal in jail, and also because he harbored animosity toward the police for an earlier drunken driving arrest, he spray painted the letters "MADD" on a police car parked outside the State Office Building in Wilmington. He was arrested, fed, and released without prosecution.

4) On another occasion Saville tried to telephone the President of the United States to complain about poor medical treatment he allegedly was receiving at a Veterans Administration Hospital.

Quaker Hill claims that there are other acts of criminal or antisocial behavior which the Commission ought to consider, and in light of the remand that opportunity will be afforded it.

In its opinion the Commission found that Quaker Hill failed to show a connection between the unusual behavior and the likelihood that Saville would engage in tenant misconduct. Furthermore, the Commission ruled that the aberrational behavior upon which Quaker Hill relied was a product of Saville's mental handicap, and thus concluded that the application was denied because of a handicap in violation of 6 *Del. C.* § 4603.

Following Quaker Hill's appeal to this Court, the Handicapped Advocacy Network of Delaware, Inc. (HANDI), represented by Community Legal Aid Society, Inc., sought and was granted leave to intervene as an amicus curiae. It has filed a brief in support of Saville's position.

## II.

This Court's scope of review of decisions of the State Human Relations Commission is limited to a determination of whether the decision is supported by substantial evidence and free from legal error. 29 *Del. C.* §§ 10142, 10161(5). Substantial evidence is more than a scintilla and less

than a preponderance. *Olney v. Cooch,* Del.Supr., 425 A.2d 610, 612 (1981); *Application of Delmarva Power & Light Co.,* Del.Super., 486 A.2d 19, 24 (1984). Stated another way, it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Pharmakinetics Laboratories, Inc. v. Comptroller of the Treasury,* Md.Sp.App., 63 Md.App. 619, 493 A.2d 408, 409 (1985). When the Superior Court sits as an intermediate court of appeals, the findings of an administrative agency must be supported by "evidence sufficient to justify" the legal conclusion reached. *Baker v. Connell,* Del.Supr., 488 A.2d 1303, 1309 (1985). The Superior Court's standard and scope of review is in accordance with *Levitt v. Bouvier,* Del. Supr., 287 A.2d 671, 673 (1972), so that if the Commission's findings are not supported by substantial evidence of record, or are not the product of an orderly and logical deductive process, then the decision under review cannot stand. See *Baker v. Connell,* 488 A.2d at 1309.

### III.

The questions presented for review are primarily a matter of what elements must be proven under 6 *Del.C.* § 4603(1), which party has the burden of proving them, and to what extent the landlord may consider both the manifestations of a handicap and unrelated past behavior in evaluating the eligibility of a prospective tenant.

I start with the elements of a cause of action under 6 *Del.C.* § 4603. See *supra* note 1. The analysis begins with our statutory law, which defines "handicap" as follows:

As used in this chapter:

(7) "Handicap" means, with respect to a person:

a. A physical or mental impairment which substantially limits 1 or more of such person's major life activities;

b. A record of having such an impairment; or

c. Being regarded as having such an impairment.

6 *Del.C.* § 4601(7).

The parties commend the Federal Rehabilitation Act of 1973, 29 U.S.C. §§ 701–794, (hereinafter the Rehabilitation Act) as analogous authority to aid the Court in construing the Delaware statute. This legislation contains a definition of handicap similar to that found in the Delaware statute.[2]

The appropriate substantive portion of the Rehabilitation Act (29 U.S.C. § 794) is § 504, which provides in pertinent part:

No otherwise qualified handicapped individual in the United States, as defined in section 7(7) [29 USCS § 706(7) ], shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive Service ...

(Emphasis added) 29 U.S.C. § 794 (hereinafter § 504)

The underscored portions of § 504 are the key differences between the Federal Act and the Delaware statute, 6 *Del.C.* § 4603. See *supra* note 1. § 504 requires that the handicapped individual be "otherwise qualified" and the exclusion must be "solely by reason of his handicap." Those two features do not appear in the Delaware law. Under the circumstances, I do not find the cases applying the components of the Federal statute to be particularly helpful in an analysis of 6 *Del.C.* § 4603. The basic elements under 6 *Del.C.* § 4603, which a party alleging handicap discrimina-

---

**2.** The applicable portion of the federal law provides:

(B) Subject to the second sentence of this subparagraph, the term "handicapped individual" means, for purposes of titles IV and V of this Act [29 USCS §§ 780 et seq., 790 et seq.],

any person who (i) has a physical or mental impairment which substantially limits one or more of such person's major life activities, (ii) has a record of such an impairment, or (iii) is regarded as having such an impairment. 29 U.S.C. § 706(7)(B).

tion must prove, are: 1) he is handicapped; 2) his application to rent was denied; and 3) the denial was because of the handicap. 6 *Del.C.* § 4603.

The central issue before me is the extent to which the manifestations of the handicap, or unrelated aberrational conduct of an applicant, may be considered in determining whether he or she is a qualified tenant. The lynch pin of Quaker Hill's argument is the Commission's finding that the unusual behavior was a product of Saville's handicap. If his conduct is not so related, then 6 *Del.C.* ch. 46 has no applicability, and the Commission would have no jurisdiction, since the rejection would lack a nexus to the handicap.

The Commission's decision was based on the idea that the parties had assumed the behavior was a manifestation of the handicap. But the record is not at all clear on this basic and essential point. Quaker Hill's position in its opening brief was that "Mr. Saville was rejected not because he was mentally handicapped, but because he had a history of unacceptable behavior." (Opening brief, p. 18). This point was further emphasized in a footnote on the same page in which Quaker Hill stated that it "should be entitled to presume that (Saville's) past conduct was not even related to his mental handicap."

Quaker Hill's alternative argument, that even "assuming" Saville's behavior was handicap related, etc., was seized upon by the Commission as a conclusive admission of such a relationship. Clearly, that was a misreading of Quaker Hill's central thesis. It provided no basis for proceeding on an unqualified assumption that the issue was undisputed. There was no stipulation to the effect that such a nexus was established, and the record does not support any reasonable conclusion that the matter was fully conceded.

Unfortunately, the Commission proceeded on the assumption that Mr. Saville's handicap and his erratic behavior were related, thereby justifying its ultimate conclusion that "denial of housing in this case

was based on certain manifestations of complainant's handicap." However, there is no substantial evidence to support that result. Mr. Saville's psychiatrist's report, while stating that the "[p]atient has had some charges for unusual behavior in the past", does not state any conclusion that such "unusual behavior" was handicap related. Indeed, the report specifically concludes that Mr. Saville was neither handicapped nor disabled, and that he was considered to be employable on either a full or part-time regular basis. If anything, this report negates the foundation of the Commission's basic premise.

While there was no evidence of any nexus between the alleged handicap and the aberrational behavior, the Commission attempted to otherwise underscore its conclusion by a sua sponte, ex parte, reference in its opinion to the Diagnostic and Statistical Manual of Mental Disorders (3d Ed., 1980), published by the American Psychiatric Association. This document was never placed in evidence, yet the Commission referred to one of the diagnostic criteria stated therein, and concluded that it was a "fair generalization for what was involved in all the incidents cited and relied upon" by Quaker Hill.

■ It is well established law in this State that a tribunal may not refer to or rely upon medical periodicals or treatises that are not in evidence. *Barks v. Herzberg*, Del.Supr., 206 A.2d 507, 509 (1965); Del.R.Evid. 803(18); see also *Ruggles v. Riggs*, Del.Supr., 477 A.2d 697, 702 (1984). Those principles apply equally to an administrative tribunal. The mandate in 29 *Del.C.* § 10142(d), that an appellate court determine whether the "agency's decision was supported by *substantial evidence on the record*" (emphasis added), would otherwise be meaningless. Moreover, fairness and due process demand no less than that a party has the right to respond to evidence used against it.

While I recognize that a reviewing court must take "due account of the experience

and specialized competence of the agency and of the purposes of the basic law under which the agency has acted" [29 *Del.C.* § 10142(d)], nothing in the record suggests that the Commission has any "specialized competence" in medical or psychiatric matters. As for the basic law under which it has acted, and given the Commission's unique character, I should think it would be the last to suggest that it has any mandate, statutory or otherwise, to disregard the law and violate the due process rights of others.

 Thus, under all the circumstances I must conclude that the record is devoid of substantial evidence to support any conclusion that there is a nexus between Mr. Saville's alleged handicap and his aberrational conduct. Given the important public policy questions of equal access to housing by the mentally handicapped, and that this is a matter of first impression before a Delaware Court, the parties should be given an opportunity to fully address these issues before their rights are finally determined. The matter will be remanded for further proceedings on the record with directions to the Commission to reopen the entire record and receive further evidence on any matters relevant to the controversy.

## IV.

To aid the Commission in the discharge of its function, upon remand, I will turn to a discussion of the remaining issues before me.

Of major concern to the parties is the extent to which the manifestations of an alleged handicap may be considered in determining whether an applicant is a qualified tenant. Quaker Hill argues that 6 *Del.C.* § 4604(c), (see *supra,* note 1), implicitly recognizes that the effect of a handicap is a permissible criterion for rejecting a rental application. This argument, however, seems broader than the actual language of 6 *Del.C.* § 4604(c). That statute allows a landlord to refuse to rent to a handicapped individual when the latter's handicap would require modification of the premises, except where the modifications are minor, nonpermanent, and the tenant bears the related expenses. Section 4604(c) limits § 4603 to dwellings that have facilities for the handicapped. A landlord is not required to modify an existing unit to accommodate a handicapped individual. The central argument for the landlord, under § 4604, would be that the apartment is not suitable for an individual because of his handicap. For example, a landlord is not required to modify a building for a wheelchair bound tenant seeking to rent a third floor apartment, the only access to which is by a steep staircase.

 Significantly, § 4603 is not an "affirmative action" statute, in that it is not remedial legislation designed to cure past acts of discrimination, cf. *Alexander v. Choate,* — U.S. —, 105 S.Ct. 712, 720–721, n. 20, 83 L.Ed.2d 661 (1985); *Southeastern Community College v. Davis,* 442 U.S. 397, 405, 410–413, 99 S.Ct. 2361, 2366, 2369–2370, 60 L.Ed.2d 980 (1979). Rather, the purpose of the statute is to afford all citizens equal rights and access to housing. 6 *Del.C.* § 4602. Thus, with minor exceptions a landlord is not required to act affirmatively to accommodate the handicapped.

A problem, however, arises when the prospective renter is mentally handicapped. In order to accommodate the manifestations of the physically handicapped some modification to the rental unit may be necessary. But the case of a mentally handicapped individual, where the handicap is likely to be manifested by forms of unusual behavior, may be quite different. The ultimate question is whether such unusual behavior can be an independent basis for rejecting the applicant.

Quaker Hill argues that it is entitled to hold all of its applicants to the same admissions requirements. The Commission held, and Saville and HANDI seem to agree, that in order for the manifestations of a mental handicap to be the basis of rejection of a rental application, the *manifestations*

*must be "limited to likely behavior as a tenant, in relation to the landlord, the property, and other tenants."* (Emphasis added). Commission Opinion pg. 10. The Commission then adopted the standard developed by the U.S. Department of Housing and Urban Development (HUD) for tenancy of multifamily housing programs [See Title 24, Housing and Urban Development; Chapter VIII—Low Income Housing, Sec. 860.201 et seq., HUD Handbook 4350.3 (1981), as expanded in a HUD memorandum of August 22, 1983]. The memo states in pertinent part:

> Specifically, some owners are admitting persons who have a *history* of failure to pay rent in a timely manner, who *cause* damage to the premises, or *who interfere* with the enjoyment of the premises by other residents. The owner is free to reject applicants who *display a history of any of the above-mentioned traits.* (Emphasis added)

HUD memorandum from K.H. Salk on tenant selection in subsidized multifamily projects with HUD-insured mortgages. (August 22, 1983).

■ Although not explicitly a part of our law, this standard seems implicitly within the spirit of 6 *Del.C.* §§ 4603, 4604. Those statutes make it clear that the landlord does not have to suffer economic loss in renting to the handicapped, and the HUD standard minimizes that likelihood. Thus, if there is evidence of a history of failure to pay rent, causing damage to the premises, or interference with the enjoyment of the premises by other tenants, a landlord may reject the tenant even though such behavior is the manifestation of a mental handicap. The principal case cited by Quaker Hill supports this result. In *Doe v. New York University*, 666 F.2d 761 (2nd Cir.1981) the plaintiff was a medical student with a mental handicap that caused her to engage in antisocial, violent and self-destructive behavior. The court held that the University could take into account her handicap, and the conduct it caused.

"... since it is directly relevant to her qualifications and bears upon her ability to function as a student and doctor, to get along with other persons, and to withstand stress of the type encountered in medical training and practice." *Id.* 777.

In the present case the landlord may consider the manifestations of the handicap as it bears on Saville's ability to function as a tenant, as defined in the above quoted HUD memorandum. This standard is limited to situations, such as the case here, where the manifestations of the mental handicap connote a risk to the owner, either economically or in terms of the landlord's duty to other tenants.

■ Thus, considering all the circumstances, I must conclude that a landlord may establish reasonable tenant qualifications for the handicapped, provided they are rationally related to the tenant's ability to meet his or her financial obligations, the safety of the premises, and the safety of other tenants. Recognizing that those with mental handicaps may exhibit unusual forms of behavior, it is vital that any qualifications imposed be neither arbitrary nor capricious so as to negate the obvious intent of our law—that those with mental handicaps are to be accorded meaningful access to housing. See *Alexander v. Choate*, —— U.S. ——, 105 S.Ct. 712, 721, 83 L.Ed.2d 661 (1985). To that end, the burden will always be upon the landlord asserting such qualifications to show that they comport with this standard.

## V.

### A.

This brings me to the ultimate questions, regarding the parties respective burdens of proof in proceedings before the Commission, where the claim is one of discrimination based on a mental handicap.

■ The Courts of Delaware follow the standard established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) in developing

the order and allocation of the burdens of proof and production of evidence in private, nonclass action, discrimination cases. See *Riner v. National Cash Register,* Del. Supr., 434 A.2d 375 (1981) (age discrimination); *Giles v. The Family Court,* Del. Supr., 411 A.2d 599 (1980) (race discrimination). *McDonnell Douglas* holds that the complainant has the initial burden of establishing a prima facie case of discrimination. If that is done, then the burden shifts to the person charged with discrimination to articulate some legitimate, nondiscriminatory, reason for the rejection. Finally, if the respondent succeeds, the burden of going forward reverts to the complainant to prove that the stated reason was a sham. *McDonnell Douglas, supra,* 411 U.S. at 802–804, 93 S.Ct. at 1824–25, 36 L.Ed.2d at 677–78. *Riner, supra* at 377; *Giles, supra* at 601–602.

 In addition to the allocation of the burdens of production of evidence, Delaware Courts have used the *McDonnell Douglas* standards to develop the elements of the prima facie case in discrimination matters. See *Riner, supra* at 376–377; *Giles, supra* at 601. Based on the analyses in *McDonnell Douglas, Riner* and *Giles,* the elements of a prima facie case, based on a claim of discrimination in the rental of apartments to the mentally handicapped, are:

1) The complaint is handicapped as defined in 6 *Del.C.* § 4601(7);

2) That the complainant was a qualified tenant;

3) That the complainant was denied the rental unit; and

4) Where applicable, that the unit was later rented to a non-handicapped person.

See *McDonnell Douglas, supra; Riner, supra* at 376–377; *Giles, supra* at 601.

Upon remand the Commission shall give due regard to the foregoing principles.

### B.

Finally, I turn to the question whether the Commission properly allocated the burdens in reaching the conclusion that Saville's application was denied because of his handicap. In my view the Commission's approach conforms to the standards stated above. Initially, it found that Saville is mentally handicapped, as defined by 6 *Del.C.* § 4601(7). The Commission then found that Saville had presented evidence from a psychiatrist and an earlier landlady that he is a qualified tenant. The doctor's report stated that Saville is able to coexist with, and not be a problem to, his cotenants despite his past conduct. However, as earlier noted, the doctor did not establish any nexus between that behavior and the alleged handicap. In fact the psychiatrist neither considered Saville handicapped nor disabled. Under the circumstances that medical opinion negates any suggestion that Mr. Saville was the victim of discrimination based upon an alleged mental handicap.

The former landlady testified that Saville paid his rent timely, got along with fellow tenants, and was someone to whom she would rent again. The final elements of the prima facie case are not germane to this issue. The denial of Saville's application is not disputed, and units are apparently still available in Quaker Hill. Thus, discussion of the remaining elements by the Commission was unnecessary.

Once the prima facie case was made, the Commission shifted the burden of production to Quaker Hill to show that Saville was rejected for nondiscriminatory reasons. The Commission found the evidence introduced by Quaker Hill, regarding Saville's "unusual" behavior, and the lay medical opinions deduced from that behavior, to be insufficient to overcome the complainant's evidence. The Commission's error was its conclusion that the unusual behavior was a manifestation of the handicap. It was compounded by the further conclusion that such behavior was unrelated to his conduct as a tenant, and was therefore not relevant to the eligibility criteria. Based on the principles established

by HUD, which I accept, the latter was an overly narrow standard.

Quaker Hill argues that the Commission incorrectly allocated the burden of proof by finding that Quaker Hill did not connect Saville's behavior to his likely success or failure as a tenant. However, I am satisfied that the Commission's statements, regarding the necessity of introducing medical testimony to establish such a nexus was an explanation of the deficiency of Quaker Hill's evidence, and not a shifting of the burden of proof. In my opinion the Commission properly allocated the burdens in this case.

Finally, in light of the remand, when the Commission addresses the nexus between the handicap and Mr. Saville's aberrant behavior, the burden must be on the complainant to establish the relationship between the two. Without such initial proof, the authority of the Commission to grant relief lacks foundation.

Accordingly, IT IS ORDERED that the findings and conclusions of the Commission be, and the same hereby are, REVERSED. This matter is REMANDED to the Commission for further proceedings consistent herewith.