

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

12-12-2007

# DiCampli v. Korman Comm

Precedential or Non-Precedential: Non-Precedential

Docket No. 06-4490

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"DiCampli v. Korman Comm" (2007). *2007 Decisions.* Paper 83.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/83

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 06-4490
_____

JENIFER WONSETLER DICAMPLI,

Appellant,

v.

KORMAN COMMUNITIES

_____

On Appeal from United States District Court
for the Eastern District of Pennsylvania
District Court No.  04-cv-2363
District Judge: Honorable Louis H. Pollak
_____

Submitted Under Third Circuit LAR 34.1(a)
December 10, 2007

Before: McKEE, CHAGARES and HARDIMAN, *Circuit Judges*.

(Filed: December 12, 2007)

_____

OPINION OF THE COURT
_____

HARDIMAN, *Circuit Judge*.

This employment discrimination case is an appeal from the District Court's grant of summary judgment in favor of Korman Communities. Plaintiff Jenifer Wonsetler DiCampli brought claims of pregnancy discrimination and retaliation under federal and state statutes after Korman demoted her while on maternity leave and subsequently terminated her when she refused to accept a transfer to another position. DiCampli appeals only the District Court's dismissal of her claim under the Family Medical Leave Act of 1993 (FMLA), 29 U.S.C. § 2601 *et seq.* Because we conclude that DiCampli cannot demonstrate that the reasons proffered by Korman for the demotion are pretextual, or that the proposed job transfer was an adverse employment action, we will affirm.

I.

Because we write for the parties, we repeat only the facts essential to our decision. DiCampli joined Korman in 1998 as the Assistant Manager of Korman's 222 West Rittenhouse Square apartment building (the Rittenhouse Building). Her duties as Assistant Manager revolved primarily around managing the Rittenhouse Building's payables and receivables, and she acquired detailed knowledge of Korman's information technology systems and administrative procedures. Her effective management of these "back of the house" functions was widely recognized by her supervisors and colleagues.

In the Spring of 2001, the position of General Manager of the Rittenhouse Building became available. Although Korman management was confident in DiCampli's administrative and management skills, there were doubts that she could effectively handle the sales and revenue-generating aspects of the General Manager's position.

2

Accordingly, while Korman decided to promote DiCampli to General Manager, it hired an additional salesperson at the Rittenhouse Building to counter DiCampli's perceived weaknesses in sales. Korman also established a bonus structure under which DiCampli would receive quarterly bonuses for meeting planned revenue targets. DiCampli's tax records indicate that she received over $7000 in bonuses during 2001. The bonus structure in place at the time of DiCampli's termination provided for quarterly bonuses of $3000 and a potential year-end bonus of $5000, all contingent upon meeting the target net operating income (NOI) for the Rittenhouse Building.

Regrettably, Korman's concerns about DiCampli's ability to generate sales and revenue were soon realized. By the end of 2001, NOI for the Rittenhouse Building was approximately $260,000 under budget. In DiCampli's first and only performance review as General Manager in March 2002, Korman Chief Operating Officer William B. Hackenburg advised DiCampli that she needed to improve on the sales aspect of her position. Korman management believed that DiCampli struggled with customer relations and was not sufficiently visible to tenants at the front desk.

In January 2002, DiCampli notified Korman that she was pregnant and intended to take maternity leave under the FMLA. Shortly after DiCampli's maternity leave commenced in late April 2002, Korman decided to reorganize the management of the Rittenhouse Building in an attempt to improve the decline in revenue. DiCampli was informed that she was being removed as General Manager and would assume the role of Operations Manager upon her return from maternity leave. Korman hired a new General

3

Manager, Justine Florian, who started work around the time that DiCampli's maternity leave ended in June 2002.

In addition to reorganizing the management at the Rittenhouse Building, Korman was also beginning to expand its information technology (IT) department. DiCampli had impressed Korman's information technology manager, Robert Mahon, during a transition to new property management software a year earlier, and she was his first choice for a new IT trainer position that was being created at Korman's offices in Plymouth Meeting, Pennsylvania. Accordingly, DiCampli was offered the IT trainer position soon after she returned from maternity leave. The salary and benefits of the IT trainer position were the same as what DiCampli was receiving as Operations Manager, although the bonus structure was more subjective.

A number of Korman's corporate officers urged DiCampli to accept the transfer, but she ultimately declined, writing in a letter to Larry Korman that she could not accept the position "due to financial hardship." The IT position would require a substantially longer commute, which DiCampli suggested would require that she purchase another family vehicle. Although she had not been told that she could remain at the Rittenhouse Building if she declined the IT trainer position, DiCampli also declared in her letter that she would remain at her current position.

Soon thereafter, DiCampli was contacted by Korman's Vice President of Sales Marketing, Mary Regina Paschall (Paschall), who urged DiCampli to reconsider the transfer. DiCampli admits that Paschall made it clear that the IT trainer position was the

4

only position that was available to her. Nevertheless, DiCampli again refused the transfer. Korman terminated DiCampli in August 2002, along with two other Rittenhouse Building employees.

II.

Korman requested summary judgment, arguing that neither DiCampli's removal from the General Manager position nor the proposed transfer to the IT department constituted an adverse employment action. Korman also argued that DiCampli could not establish that Korman's stated nondiscriminatory reason for these decisions was pretextual. The District Court found that material issues of fact existed with respect to whether DiCampli's removal as General Manager was an adverse employment action, but that she had failed to adduce sufficient evidence to allow a reasonable jury to disbelieve Korman's stated reason for the change. The District Court also held that the transfer to the IT trainer position was not an adverse employment action, and, alternatively, DiCampli had not demonstrated that Korman's asserted rationale for the transfer was pretextual.

To recover for retaliation under the FMLA, DiCampli must demonstrate that: (1) she took FMLA leave; (2) she suffered an adverse employment action; and (3) the adverse employment action was causally connected to her taking of FMLA leave. *Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 135, 146 (3d Cir. 2004). FMLA retaliation claims are analyzed using the familiar three-step framework of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). At issue with respect to DiCampli's

5

removal from the General Manager's position is the third step of that burden-shifting framework, in which the plaintiff bears the burden of demonstrating that the employer's asserted justification is simply a pretext designed to mask discrimination.

To avoid summary judgment under the third step of the *McDonnell Douglas* framework, the plaintiff must "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994). The plaintiff must adduce evidence sufficient to "allow a factfinder reasonably to infer that *each* of the employer's proffered non-discriminatory reasons was either a *post hoc* fabrication or otherwise did not actually motivate the employment action." *Id.* (emphasis in original)(internal citation omitted). To do so, the plaintiff must "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reason for its action that a reasonable factfinder *could* rationally find them unworthy of credence and hence infer that the employer did not act for [the asserted] non-discriminatory reasons." *Id.* at 765 (emphasis in original)(internal quotations and citations omitted). It is not sufficient to show that the employer's decision was wrong, mistaken, imprudent or incompetently made. *Id.*

DiCampli argues that her overall favorable performance review and the quarterly bonuses she received throughout her time as General Manager belie the consistent

6

assertions of Korman's executives that she was removed from her General Manager position because of declining sales at the Rittenhouse Building. Yet a closer examination of DiCampli's performance review actually bolsters Korman's account. Indeed, that review explicitly notes that DiCampli needed to become more involved with sales, the precise issue that motivated Korman to remove DiCampli. Likewise, DiCampli overlooks the consistent testimony of Korman's corporate officers that she did not reach her revenue goals but nevertheless received *partial* bonuses in an effort to incentivize her to improve. DiCampli's receipt of quarterly bonuses does not mean, as she suggests, that she was meeting her revenue goals and that Korman was entirely satisfied with her sales performance. That granting DiCampli partial bonuses despite her poor performance may have been an imprudent or misguided business decision is, of course, beside the point. *See, e.g., Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1109 (3d Cir. 1997).

DiCampli also challenges the District Court's holding that the proposed transfer to the IT trainer position was not an adverse employment action. A plaintiff claiming retaliation must show that a reasonable employee would have found the alleged retaliatory action "materially adverse" in that it "well might have dissuaded a reasonable worker" from exercising a right under the FMLA. *See Moore v. City of Phila.*, 461 F.3d 331, 341 (3d Cir. 2006) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 126 S. Ct. 2405, 2415 (2006)).

In this case, DiCampli was asked to transfer to a position with identical pay and benefits to what she received as Operations Manager. DiCampli argues that the IT trainer

7

position was a "desk job" that offered less prestige and fewer opportunities for performance bonuses. Yet she offers no objective evidence to suggest that the IT trainer position was less desirable or prestigious than that of Operations Manager. *See O'Neal v. City of Chicago*, 392 F.3d 909, 913 (7th Cir. 2004) (finding that "purely subjective preferences for one position over another" do not establish adverse employment action); *Cf. Burlington Northern*, 126 S. Ct. at 2417 (transfer from position that was "objectively considered a better job" to a position that was "by all accounts more arduous and dirtier" can be adverse employment action). Nor does she present any evidence that the opportunities for bonuses in the IT trainer position were markedly different. Indeed, as the District Court observed, the record suggests that DiCampli might have done better in the new position given that her bonuses as Operations Manager were linked to revenues that were in steep decline. Finally, the mere fact that the IT position would have required a change in location and a longer commute is not sufficient to constitute an adverse action. *See, e.g., Hoffman v. Rubin,* 193 F.3d 959, 964 (8th Cir. 1999) (transfer from St. Paul to Chicago not adverse employment action because rank, pay, and other benefits unaltered). Under these circumstances, we are unable to conclude that the proposed transfer to the IT department was so materially adverse as to deter a reasonable employee in DiCampli's position from exercising her FMLA rights.

Even if we were inclined to find that a reasonable trier of fact could find that the transfer to the IT position was an adverse action, we are in full agreement with the District Court that DiCampli has adduced no evidence that Korman's asserted rationale

8

for transferring her was pretextual.  DiCampli offers nothing, save her own subjective belief, to suggest that the demotion to Operations Manager and subsequent transfer offer was simply a ruse meant to provide Korman with a plausible excuse to terminate her. Moreover, the record evidence that DiCampli had demonstrated strong administrative and IT skills and would be a strong fit for the IT trainer position is entirely uncontradicted.

For the foregoing reasons, we will affirm the District Court's grant of summary judgment in favor of Korman.