**Andre BOGGERTY, Kim Boggerty, Barbara Bryant, Larry Bryant, Jameira Burke, Arnola Burke–Dixon, Kemmeisha Burris, Kemuel Butler, Harold Dixon, Victoria Fuentes–Cox, Tracy Harvey, Chauntel Hayward, Brian Jordan, Sonji McCulley, William Greg**

---

McCulley, Chontel (McMillan) Stephens, Barbara O'Neal, Delores Percy, Trisha Scott, Monica Sewell, Rosa Smith, Robert Waters, Theresa Williams, Appellees Below, Appellants,

v.

David STEWART and Carmike Cinemas, Inc. d/b/a Carmike 14, Appellants Below, Appellees.

No. 489, 2010.

Supreme Court of Delaware.

Submitted: Jan. 19, 2011.

Decided: Feb. 17, 2011.

Reargument Denied March 24, 2011.

Richard H. Morse (argued) and Umbreen S. Bhatti, Esquires, of the American Civil Liberties Union of Delaware, Wilmington, Delaware; for Appellants.

Matt Neiderman (argued) and Gary W. Lipkin, Esquires, of Duane Morris LLP, Wilmington, Delaware; Of Counsel: Christina H. Bost Seaton, Esquire, of Troutman Sanders LLP, New York, New York; for Appellees.

Before HOLLAND, BERGER and JACOBS, Justices.

JACOBS, Justice:

This case arises out of a claimed violation of the Delaware Equal Accommodations Law ("DEAL"), 6 *Del. C.* § 4500 *et seq.*, which prohibits denying access to public accommodations on the basis of race or color. The appellants, Andre Boggerty et. al.[1] (collectively, "Appellants"), claim that the Appellees, David Stewart ("Stewart") and his employer, Carmike Cinemas, Inc. d/b/a Carmike 14 ("Carmike Cinemas"), violated the DEAL. The Appellants' specific claim is that Stewart "insulted, humiliated, and demeaned" them by making a public announcement asking a movie theater audience to turn off their cell phones, remain quiet, and stay in their seats before a movie showing at the Carmike Cinemas Dover location. After conducting a hearing, the Delaware State Human Relations Commission ("Commission") found that Stewart's conduct violated Section 4504(a) of the DEAL,[2] and awarded Appellants $1,500 each in damages, and attorneys' fees and costs; and also ordered Carmike Cinemas to pay $5,000 to the Special Administration Fund under Section 4508(h)(1) of the DEAL.[3] On appeal, the Superior Court reversed the Commission's decisions, and the Appellants appealed to this Court. For the reasons next discussed, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. The Pre–Show Announcement

On October 12, 2007, the Appellants, all of whom are African–American, went to Carmike Cinemas in Dover, Delaware, to see a new Tyler Perry movie, "Why Did I Get Married?"[4] Anticipating a large turnout based on the number of advance ticket sales, Stewart, who was a Caucasian male and the theater manager, scheduled the movie to be shown simultaneously in three auditoriums. The largest auditorium seated 130 people; the other two each seated 50 persons.

---

1. The 23 named Appellants are: Andre Boggerty, Kim Boggerty, Barbara Bryant, Larry Bryant, Jameira Burke, Arnola Burke–Dixon, Kemmeisha Burris, Kemuel Butler, Harold Dixon, Victoria Fuentes–Cox, Tracy Harvey, Chauntel Hayward, Brian Jordan, Sonji McCulley, William Greg McCulley, Chontel (McMillan) Stephens, Barbara O'Neal, Delores Percy, Trisha Scott, Monica Sewell, Rosa Smith, Robert Waters, and Theresa Williams.

2. 6 *Del. C.* § 4504(a) provides that "[n]o person being the owner ... manager ... or employee of any place of public accommodation, shall directly or indirectly refuse, withhold from or deny to any person, on account of race [or] color ... any of the accommodations, facilities, advantages or privileges thereof."

3. 6 *Del. C.* § 4508(h)(1) provides that upon finding that a violation of Section 4504 has occurred:

> To vindicate the public interest, the [Commission] may assess a civil penalty against the respondent(s), to be paid to the Special Administration Fund:
> (1) In an amount not exceeding $5,000 for each discriminatory public accommodations practice if the respondent has not been adjudged to have committed any prior discriminatory public accommodations practice.

4. According to Appellants, Tyler Perry movies are geared towards the minority community.

When Appellants arrived at the theater, they handed their tickets to the ticket agent and received a ticket stub in return. Approaching the auditorium, they saw two security guards. The security guard standing outside the door to the largest auditorium asked to see Appellants' ticket stubs. Appellants displayed their ticket stubs and were admitted into the largest auditorium. That auditorium was full. Of those attending, 90–95% were African-American.[5]

Before the show, the theater screen displayed messages reminding patrons to turn off their cell phones and to refrain from talking during the movie. Before the movie began, Stewart also made a live announcement to the same effect. He asked the patrons to turn off their cell phones, to stay quiet, and to remain seated throughout the movie. After that announcement, Stewart left the auditorium.

After Stewart left, Appellant Larry Bryant followed him outside and told Stewart that his remarks were not well-taken. Stewart immediately returned to the auditorium and apologized to the audience, explaining that he did not mean to offend anyone and that he was required to make the announcement under Carmike Cinemas' current policy.

At some point during this episode a woman, who later was identified as Juana Fuentes–Bowles, the Director of the State Human Relations Division, stood up and told everyone that she felt that Stewart's announcement was racist. After identifying herself—not by her official title but as an attorney or someone who worked for an attorney—Fuentes-Bowles circulated a sign-up sheet and asked all audience members who were offended by Stewart's announcement to write down their contact information. The Appellants all did that, after which the audience then proceeded to watch the movie in its entirety without further incident. After the movie ended, Stewart waited at the auditorium exit door to say "good night" and thank the audience members for attending the show.

B. *Proceedings before the Commission*

After the October 12, 2007 movie showing, Sharese McGhee, an employee of the Delaware State Human Relations Division, contacted the audience members who had filled out the sign-up sheet and arranged a meeting at which Fuentes–Bowles was present. After the meeting, a draft complaint was circulated, and thirty-three persons filed complaints against Stewart and Carmike Cinemas before the State Human Relations Commission. All the complaints alleged a violation of Section 4504 of the DEAL, specifically, that Appellants were denied access to a public accommodation (Carmike Cinemas) based on their race or color, because Stewart delivered his announcement in a "condescending tone" that deprived Appellants of their right to equal accommodations.[6] Stewart and Carmike Cinemas defended on the ground that Stewart's announcement was neither discriminatory nor insulting, and was made to further the enjoyment of all of the movie patrons in accordance with Carmike Cinemas' policy.

The Commission held a two-day hearing on November 6 and 10, 2008. Three of the

---

5. Although Stewart testified that the two smaller theater auditoriums also had full audiences, the record discloses no information about the racial composition of either of those audiences.

6. Although Fuentes–Bowles was initially a named complainant, she later withdrew her own complaint against Carmike Cinemas "so that the [Appellees] will not be able to use my inclusion in this case to distract from [their] discriminatory conduct." Ltr. from Dir. Of the Div. of Human Relations (Apr. 14, 2008).

testifying Appellants gave substantially similar testimony, namely, that they were offended by the tone and manner in which Stewart made his announcement (but not by his actual words), and that Stewart's tone was offensive and condescending, as if he were speaking to children.[7] Those three testifying Appellants also believed that Stewart made the announcement because the audience was primarily African–American and who, therefore, would not know how to behave properly in a theater. None of the Appellants had ever heard such an announcement ever made before. Nor was the presence of a security guard checking their ticket stubs anything that they had ever experienced in previous Carmike Cinemas showings.

Four witnesses testified on behalf of the Appellees: Stewart; Thomas D. Bridgman, II; and two members of the same audience at the October 12, 2007 showing. The two audience members, Lina Powell and Sharron Lowery, testified that they did not believe that they had been treated differently because of their race. Nor did they find Stewart's announcement offensive, or believe that the announcement was racially motivated, because white people were also in attendance in the theater auditorium that night. Lastly, Powell and Lowery testified that they did not find the presence of the security guard unusual in any respect.

Stewart testified that he had recently been transferred to the Dover Carmike Cinemas location after previously working as the theater manager at Carmike Cinemas' Olean, New York location. According to Stewart, the Carmike Cinemas division, which encompassed both the Dover and the Olean locations, implemented a 2005 pre-showing announcement policy because of problems experienced with patrons talking and using their cell phones during movie showings. Stewart did not know whether his predecessor had ever made that announcement at the Dover location. Stewart did say, however, that he used his discretion when making the announcements at the Olean location, doing that only at those times when the movie had sold out.[8]

Because he had worked at the Dover location for only four months, Stewart had made the announcement there only twice before—during the Friday and Saturday night showings of the movie "Halloween," which was played the week before the October 12th incident. At that particular movie, most of the audience members were teenagers, and Stewart made the announcement at either the 7:15 p.m. or 9:45 p.m. show on both Friday and Saturday nights, in whichever auditorium had the greater attendance.

Stewart denied that his announcement at the Tyler Perry movie was motivated by the audience's race. Stewart had never been accused of racism after making the two announcements at the "Halloween" movie during the previous weekend, nor at any time when he had made similar announcements at the Olean, New York location. Stewart also testified that the security guards had been hired for safety reasons, because of an earlier robbery and violence that had occurred at the Dover theater in February 2007, before he became theater manager. On the night in question, one of the security guards had been assigned to check the audience's tickets to direct patrons to the correct auditorium, since three simultaneous showings

---

7. Two other complainants testified to the same effect. One complainant, Pamela Sterling, did not appeal from the Superior Court's decision.

8. To Stewart, "sold out" meant that at least ninety percent of the seats were sold.

of the movie were being played. Initially, Stewart intended to make the same announcement at the two smaller auditoriums, but did not do so, because instead he returned to the largest auditorium to apologize to the audience.

Thomas Bridgman, the Carmike Cinemas' division manager, testified that the announcement policy was not company-wide in scope. Rather, that policy was implemented within his specific division to address numerous prior complaints about the use of cell phones, talking, and babies crying during movie showings. Although initially implemented in October 2005 as a mandatory policy, the practicalities of running a movie theater later resulted in a modification, specifically, to allow each theater manager to use his or her discretion in deciding when to make the announcement. Ultimately, that policy was discontinued in March 2008, four months after the events at issue in this case, because Carmike Cinemas decided to communicate the same message by using new pre-show movie slides.

The Commission concluded that Appellants had made a *prima facie* showing of discrimination because: (a) they were members of a protected class; (b) they were denied access to a public accommodation, and (c) nonmembers of the protected class were treated more favorably.[9] In determining that Appellants had been denied access to a public accommodation, the Commission found that although all Appellants were permitted to watch the movie, the circumstances under which they did

that were "hostile, humiliating, and demeaning,"[10] and thereby constituted "receiv[ing] services in a markedly hostile manner and in a manner which a reasonable person would find objectively unreasonable."[11] The Commission also concluded that nonmembers of the protected class had been treated more favorably. The Commission arrived at that conclusion first, by finding Stewart's and Bridgman's testimony concerning the announcement policy (and its non-racial purpose) to be "not credible," and second, by then inferring that the announcement must have been racially motivated.[12] On that basis, the Commission found Stewart's conduct constituted a violation of Section 4504(a) of the DEAL. The Commission awarded each Appellant $1,500 in damages, ordered Carmike Cinemas to pay $5,000 to the Special Administration Fund "to vindicate the public interest," and awarded Appellants $21,704 in attorneys' fees and costs.[13]

## C. The Superior Court Decision

On appeal, the Superior Court reversed the Commission's decision on two separate grounds. First, the court concluded that the Commission had erred as a matter of law in applying the "markedly hostile" test as the basis for its finding that Appellants were denied access to a public accommodation.[14] Second, the court found that there was no substantial evidence to support the Commission's determination that "a subjectively rude announcement" constituted a denial of access within the purview of the DEAL.[15] Those two Superior Court rulings

9. *See* Panel Decision & Order at 38, 47, 55–56.

10. *Id.* at 47.

11. *Id.* (quoting *Hadfield's Seafood v. Rouser,* 2001 WL 1456795, at *5 (Del.Super.Ct. Aug. 17, 2001)).

12. *Id.* at 55–56.

13. *Id.* at 61–62.

14. *Stewart v. Human Relations Comm'n,* 2010 WL 2653453, at *5 (Del.Super.Ct. July 6, 2010).

15. *Id.* at *6; *see also id.* at *6 n. 33 (citing cases where subjective perceptions of discrimination were found to be unactionable).

are the subject of the Appellants' challenge on this appeal.

## ANALYSIS

 This Court's review of a decision of a Delaware administrative agency, including the Commission, mirrors that of the Superior Court. That is, the scope of our review is limited to determining whether the Commission's decision is supported by substantial evidence and is free from legal error.[16] "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[17] We do not "weigh the evidence, determine questions of credibility, or make [our] own factual findings."[18] Rather, we determine "if the evidence is legally adequate to support the agency's factual findings."[19] Where the findings are not supported by substantial evidence, or are not the product of an orderly and logical reasoning process, "then the decision under review cannot stand."[20]

 Section 4504(a) of the Equal Accommodations Act relevantly provides that:

No person being the owner, lessee, proprietor, manager, director, supervisor, superintendent, agent or employee of any place of public accommodation, shall directly or indirectly refuse, withhold from or deny to any person, on account of race, age, marital status, creed, color, sex, disability, sexual orientation or national origin, any of the accommodations, facilities, advantages or privileges thereof.[21]

To succeed on a claim of unlawful discrimination, a plaintiff must first establish a *prima facie* case of discrimination. That requires the plaintiff to establish three elements: (a) that the plaintiff is a member of a protected class, (b) that the plaintiff was denied access to a public accommodation, and (c) that persons who were not members of the protected class were treated more favorably.[22]

 In evaluating a claim of this kind, we are guided by the analytical framework articulated by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*[23] and adopted by this Court in *Thompson v. Dover Downs, Inc.*[24] Under that analysis, once the plaintiff establishes a *prima facie* case of discrimination, the burden then shifts to the defendant to produce evidence of a legitimate, non-discriminatory reason for denying the plaintiff access.[25] If the defendant produces

**16.** *See* 29 *Del. C.* § 10142(d) (establishing standard of review for agency decisions); *see also Quaker Hill Place v. State Human Relations Comm'n,* 498 A.2d 175, 178 (Del.Super.Ct.1985).

**17.** *DP, Inc. v. Harris,* 2000 WL 1211151, at *6 (Del.Super.Ct. July 31, 2000) (citing *Oceanport Indus., Inc. v. Wilm. Stevedores, Inc.,* 636 A.2d 892, 899 (Del.1994) and *Battista v. Chrysler Corp.,* 517 A.2d 295, 297 (Del.Super.Ct.1986)).

**18.** *Id.*

**19.** *Id.*

**20.** *Quaker Hill Place,* 498 A.2d at 179 (citing *Baker v. Connell,* 488 A.2d 1303, 1309 (Del. 1985)).

**21.** 6 *Del. C.* § 4504(a).

**22.** *Uncle Willie's Deli v. Whittington,* 1998 WL 960709, at *4 (Del.Super.Ct. Dec. 31, 1998) (citing *Ezold v. Wolf, Block, Schorr & Solis–Cohen,* 983 F.2d 509, 522 (3d Cir.1992) and *Giles v. Family Ct. of Del.,* 411 A.2d 599, 601 (Del.1980)).

**23.** 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

**24.** 887 A.2d 458 (Del.2005).

**25.** *McDonnell Douglas,* 411 U.S. at 802–03, 93 S.Ct. 1817.

such evidence, then the burden shifts back to the plaintiff to show by a preponderance of the evidence that the defendant's proffered reason was merely pretextual.[26]

We conclude that the judgment of the Superior Court must be affirmed, because the Appellants have failed to establish a *prima facie* case of racial discrimination. Specifically, there was no showing of disparate treatment as between minority and non-minority audience members. Moreover, the Commission erred in concluding that Stewart's statement was racially motivated, because that conclusion rests on an improper application of the burden-shifting *McDonnell Douglas* analysis.

## I. There Was No *Prima Facie* Disparate Treatment

For DEAL purposes, disparate treatment occurs where a decision maker "simply treats some people less favorably than others because of their race, color . . . or [other protected characteristic]."[27] In disparate treatment cases, "[p]roof of motive to discriminate . . . is an essential element of the complainant's case."[28]

Appellants here did not (and cannot) establish a *prima facie* case of discrimination, because the undisputed facts show that there was no disparate treatment as between the African–American and non-African-American members of the relevant audience. All audience members were treated the same way: all those who attended the Tyler Perry movie that night in the largest auditorium heard the Stewart announcement. The Appellants (who were African–American) were treated no differently from all other audience members in the auditorium, including other non-complaining African–Americans such as Lina Powell and Sharron Lowery, plus Caucasian and other non-minority attendees.[29]

This was not a case where the Appellants were denied a public accommodation that was provided to other similarly-situated persons.[30] By way of example, the treatment would be disparate had Stewart made the announcement only to the complaining Appellants, or only to the African–American audience members; but not to the rest of the audience. But that did not occur: all members of the audience, regardless of race or color, received the identical message. Therefore, Appellants failed to establish disparate treatment as between themselves and the other members of the audience.

## II. The Commission Erroneously Found That Stewart's Statement Was Racially Motivated

Even if Appellants had established a *prima facie* case of racial discrimination (as the Commission concluded), the Superior Court's decision must stand, be-

---

26. *Id.*

27. *Int'l Bhd. of Teamsters v. United States,* 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977); *see also Newark Landlord Ass'n v. City of Newark,* 2003 WL 21448560, at *10 (Del.Ch. June 13, 2003).

28. *Quaker Hill Place v. Saville,* 523 A.2d 947, 955 (Del.Super.Ct.1987), *aff'd,* 531 A.2d 201 (Del.1987); *see also Teamsters,* 431 U.S. at 335 n. 15, 97 S.Ct. 1843 (noting that in order to show disparate treatment, "[p]roof of discriminatory motive is critical").

29. The undisputed facts show that between 90–95% of the audience in the theater that night was African–American.

30. *See Russo v. Corbin,* 2002 WL 88948, at *8 (Del.Super.Ct. Jan. 8, 2002) (upholding Commission's finding that an all-white group of diners were treated more favorably than the group that contained people of mixed racial ethnicities, even though both groups had acted in exactly the same manner by failing to sign in with the hostess and pushing their dining tables together).

cause the Commission misapplied the *McDonnell Douglas* burden-shifting rule. In concluding that Stewart's statement was "racially motivated," the Commission erred in two respects. First, the Commission erroneously found that Appellees had failed to introduce "credible evidence" of a legitimate nondiscriminatory reason for denying Appellants access.[31] As the United States Supreme Court has explained, Appellees' burden is one of *production,* not persuasion.[32] Appellees discharged their burden of production. The burden of *persuasion,* however, remains at all times with the complaining plaintiffs.[33] Second, the Commission concluded—erroneously— that the Appellants had discharged their burden of persuasion on that issue.

A. *Appellees Produced Evidence Of A Legitimate Nondiscriminatory Purpose*

As the United States Supreme Court has held, "[w]hen the plaintiff has proved a *prima facie* case of discrimination, the defendant bears only the burden of explaining clearly the nondiscriminatory reasons for its actions."[34] That burden is satisfied "if [the defendant] simply 'explains what he has done' or 'produces evidence of legitimate nondiscriminatory

reasons.' "[35] The defendant need not introduce evidence to *"persuade* the trier of fact that the [defendant's] action was lawful," because any such requirement would "exceed[ ] what properly can be demanded to satisfy a burden of production."[36]

In finding that there was no "credible evidence" of a legitimate, non-discriminatory purpose for Stewart's announcement, the Commission legally erred.[37] The record establishes that Appellees discharged their burden of producing such credible evidence. Stewart testified that he did not intend to offend anyone by making his announcement, that he did not intentionally single out Appellants based on their race or color, and that he made the announcement because of company policy since the movie showing had been sold out. Stewart's actions—returning to the theater and apologizing to the audience for any unintended slight—buttressed his testimony, as did the testimony of division manager Bridgman. Mr. Bridgman confirmed that it was company policy to make such an announcement at the theater manager's discretion. The Commission itself acknowledged that such a company policy existed,[38] and from a discrimination

31. Panel Decision & Order at 56 ("The Panel finds no credible evidence that [Appellees] had a legitimate non-discriminatory reason for making the announcement at "Why Did I Get Married?").

32. *Texas Dept. of Cmty. Affairs v. Burdine,* 450 U.S. 248, 255, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

33. *Id.* at 256, 101 S.Ct. 1089 ("The plaintiff retains the burden of persuasion.").

34. *Id.* at 260, 101 S.Ct. 1089.

35. *Id.* at 257, 101 S.Ct. 1089 (internal citations omitted).

36. *Id.*

37. *See Russo v. Corbin,* 2002 WL 88948, at *8 (Del.Super.Ct. Jan. 8, 2002) (holding that where the defendant must introduce evidence of a legitimate, nondiscriminatory motive under the *McDonnell Douglas* framework, "it is unnecessary for the Commission to determine [at that stage] whether it was actually persuaded by the [defendant's] proffered explanation, so long as the [defendant has] set forth some evidence to support [his] assertions of a nondiscriminatory reason.").

38. *See* Panel Decision & Order at 55 (recognizing that Bridgman had implemented a division-wide policy requiring announcements).

standpoint, that policy was facially neutral. Appellees, accordingly, met their burden of production. The effect was to shift the burden back to the Appellants to adduce evidence sufficient to establish that the "company policy" explanation was merely pretextual.[39] That latter burden was never satisfied.

### B. *Appellants Did Not Meet Their Burden To Show That The "Company Policy" Was Pretextual*

 Second, the Commission erred separately by concluding that Appellants had discharged their burden to show that Stewart's explanation for making the announcement was a pretext. As the U.S. Court of Appeals for the Tenth Circuit has held, "[t]o raise an inference of pretext in the face of the [defendant's] legitimate, nondiscriminatory explanation, the plaintiff must undermine the [defendant's] credibility to the point that a reasonable jury could not find in its favor."[40] Stated differently, the plaintiff must present evidence sufficient "that a jury could find that the [defendant] lacks all credibility."[41]

 Here, the Commission summarily found Stewart's and Bridgman's testimony regarding Carmike Cinemas' policy to be "not credible." But, nowhere did the Commission state any reason why. That conclusory finding is not sufficient to show that Appellees lacked "all credibility," and is not entitled to deference. As the United States Court of Appeals for the Eleventh Circuit has stated, "identification of inconsistencies in the defendant's testimony [can be] evidence of pretext, but the 'mere denial of credibility' has no evidentiary value."[42]

The Commission did not identify any inconsistencies in Stewart's or Bridgman's testimony by showing (for example) that at other sold-out movies at Carmike Cinemas during the previous four months of Stewart's management, Stewart never made the pre-show announcement.[43] Equally important, the Commission did not identify any evidence showing affirmatively that Stewart's statement was racially motivated. Instead, it appears that the Commission drew the inference that because Stewart's explanation of the announcement's purpose was "not credible," the announcement must therefore have been racially motivated.[44] Apart from its being a *non sequitur,* that inference incorrectly applied the *McDonnell Douglas* analysis, which requires Appellants affirmatively to prove by a preponderance of the evidence that Stewart's explanation was pretextual.

Appellants never introduced any such affirmative evidence. It is undisputed that the Tyler Perry movie showing was not the first time Stewart had made the announcement herein complained of. The Commission itself found that Stewart had made a similar announcement twice during the previous weekend showing of "Hallow-

---

**39.** *See Burdine,* 450 U.S. at 256, 101 S.Ct. 1089.

**40.** *Jaramillo v. Colo. Jud. Dept.,* 427 F.3d 1303, 1310 (10th Cir.2005); *see also Staten v. New Palace Casino, LLC,* 187 Fed.Appx. 350, 361 (5th Cir.2006) (same).

**41.** *Jaramillo,* 427 F.3d at 1310.

**42.** *Ekokotu v. Boyle,* 294 Fed.Appx. 523, 526 (11th Cir.2008) (internal citation omitted).

**43.** *See, e.g., Josey v. John R. Hollingsworth Corp.,* 996 F.2d 632, 640 (3d Cir.1993) (noting that a factfinder can use "inconsistencies to find [that] the [defendant's] stated reasons were pretextual, and render a verdict for [the plaintiff].''); *Russo v. Corbin,* 2002 WL 88948, at *8 (Del.Super.Ct. Jan. 8, 2002) (noting that "several inconsistencies" in a defendant's testimony supported the Commission's finding that that testimony was not credible).

**44.** Panel Decision & Order at 56.

een."[45] Moreover, two audience members testified that they did not find Stewart's announcement offensive or think that it was racially motivated. All the Appellants could point to as proof of "pretext," were their own subjective beliefs that Stewart's announcement was racially motivated. But the subjective beliefs of complaining Appellants, however sincere, will not suffice to show that Carmike Cinemas' policy requiring that announcement was "merely pretextual." If the only evidence required to show pretext were the plaintiff's own subjective beliefs, the *McDonnell Douglas* burden-shifting requirement would be eviscerated.

 As many courts have recognized, a complaining plaintiff's subjective personal judgments or beliefs, without more, will not raise a genuine issue of material fact as to whether the defendant's proffered non-discriminatory reason for the challenged conduct is pretextual.[46] A complaining plaintiff "must do more than establish a *prima facie* case and deny the credibility of the [defendant's] witnesses. The plaintiff must also offer *specific* and *significantly probative* evidence that the [defendant's] alleged purpose is a pretext for discrimination."[47] Here, Appellants introduced no specific affirmative evidence sufficient to raise a question of material fact as to whether Stewart's "company policy" explanation was a pretext. Therefore, the Commission's finding that Stewart's statement to the theater audience was racially motivated lacks evidentiary support. On this basis as well, the Superior Court correctly reversed the rulings of the Commission.

**45.** *Id.* at 55.

**46.** *See, e.g., Salinas v. AT & T Corp.,* 314 Fed.Appx. 696, 699 (5th Cir.2009) (*per curiam*); *DiCampli v. Korman Communities,* 257 Fed.Appx. 497, 501 (3d Cir.2007); *Robinson v. Honeywell, Micro Switch Div.,* 53 Fed. Appx. 379, 381 (7th Cir.2002); *Schuler v.*

*CONCLUSION*

For the above reasons, the judgment of the Superior Court is affirmed.

*Chronicle Broadcasting Co., Inc.,* 793 F.2d 1010, 1011 (9th Cir.1986) (citing *Smith v. Flax,* 618 F.2d 1062, 1067 (4th Cir.1980)).

**47.** *Schuler,* 793 F.2d at 1011 (emphasis added) (internal citation omitted).