# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

AL-SAMEEN T. KHAN, PH.D., )
)
      Plaintiff, )
) C.A. No.: N14C-05-148 AML
      v. )
)
DELAWARE STATE UNIVERSITY )
and NOUREDDINE MELIKECHI, ) JURY TRIAL DEMANDED
)
      Defendants. )

Submitted: March 22, 2016
Decided: June 24, 2016

**Upon Defendants' Motion for Summary Judgment – Denied**
**Upon Plaintiff's Motion for Partial Summary Judgment – Granted, in Part**

## <u>MEMORANDUM OPINION</u>

Gary W. Aber, Esquire, of LAW OFFICE OF GARY W. ABER, Wilmington, Delaware; Attorney for Al-Sameen T. Khan, Ph.D.

James D. Taylor Jr., Esquire and Gerard M. Clodomir, Esquire, of SAUL EWING LLP, Wilmington, Delaware; Attorneys for Delaware State University and Noureddine Melikechi.

**LeGROW, J.**

The plaintiff, who was a tenured professor at Delaware State University at the time of the events in question, alleges the University violated state and federal law, as well as the terms of a collective bargaining agreement, when it disciplined and ultimately terminated him in January 2013. Plaintiff also contends the dean of the college in which he taught tortiously interfered with Plaintiff's contract with the University. The University in turn contends Plaintiff acted in bad faith by demanding arbitration after his discharge and then withdrawing from that arbitration on the eve of the hearing.

Plaintiff is seeking summary judgment for his breach of contract claims and the University's bad faith counterclaim. Defendants oppose that motion and also contend they are entitled to summary judgment for Plaintiff's age discrimination and tortious interference claims. This is my decision on the pending motions. As explained below, disputed issues of material fact preclude summary judgment as to all but the claim Plaintiff acted in bad faith in withdrawing from the arbitration.

## FACTUAL AND PROCEDURAL BACKGROUND

Unless otherwise noted, the following facts are undisputed. The plaintiff, Al-Sameen T. Khan, Ph.D. ("Dr. Khan"), was employed as a professor of electrical engineering by Defendant Delaware State University ("DSU") from January 1, 1988 until January 16, 2013. Dr. Khan was a professor of the College of Mathematics, Natural Sciences & Technology ("CMNST") at DSU and received

tenure in September 1997. At all times relevant to the claims in this action Defendant Noureddine Melikechi ("Dean Melikechi") was dean of CMNST. On January 16, 2013, DSU discharged Dr. Khan from his employment. That discharge, and the events leading up to it, form the basis of the claims in this action.

## A. The collective bargaining agreement

As a tenured professor at DSU, Dr. Khan was subject to a collective bargaining agreement (the "CBA") negotiated between the DSU Board of Trustees and the DSU chapter of the American Association of University Professors (the "AAUP"). The CBA became effective July 1, 2010, and the parties agree that it was in effect and applied to Dr. Khan's suspension and ultimate discharge. Several provisions of the CBA are relevant to this dispute. For that reason, before detailing the facts underlying this case, I will outline the pertinent sections of the CBA.

The CBA provides that a "Unit Member," a term that is defined to include all full-time "voting" faculty, only may be disciplined for "Just Cause."[1] Although discipline does not appear to be defined in the CBA, the term includes "Discharge," which the agreement defines as "an action taken by [DSU] to permanently discharge from employment at the University a tenured member of

---

[1] CBA § 10.4.1.

the faculty . . . prior to the end of a specified term."[2] DSU has "Just Cause" to discipline a unit member only upon "substantiated charges directly and substantially related to the fitness of the affected unit member to perform professional responsibilities."[3] The CBA goes on to specify that discharge proceedings may be instituted for a number of reasons, including, pertinently:

> 10.4.3(A) Failure to perform professional responsibilities either through incompetence, persistent negligence, refusal to carry out reasonable assignments, or disregard for or failure to meet scholarly and professional standards and ethics.

> 10.4.3(E) Serious personal misconduct of such a nature as to warrant and evoke the condemnation of the academic community.[4]

The CBA provides certain procedures that must be followed whenever DSU is considering disciplining tenured faculty.[5] In the event a dispute arises between DSU and a unit member subject to discipline, there is an arbitration clause in the CBA.[6] The issues in this case concern, among other things, whether DSU properly discharged Dr. Khan under the CBA.

One of the disputes in this action requires determination of the meaning of "professional responsibilities" as that term is used in Sections 10.4.2 and 10.4.3A of the CBA. "Professional responsibilities" is not defined in the CBA. Plaintiff

---

[2] *Id.*
[3] *Id.* § 10.4.2.
[4] *Id.* § 10.4.3.
[5] *Id.* § 10.4.4.
[6] *Id.* §§ 10.4.4, 10.4.5. A unit member may, but is not required to, demand arbitration.

contends the term is interchangeable with "Academic Load," which is defined in Section 12.2 as:

> Formal and informal instruction, tutorials, advisement and counseling of students, research and writing, preparation of new courses and updating of other courses, service on various campus committees and the rendering of other professional services. Credit offerings, whenever scheduled (day, night, weekends, or summer) will be the responsibility of the Vice President of Academic Affairs, the Academic Deans, and the academic departments.

DSU disagrees; unfortunately, the parties did not squarely address this dispute in their briefing. Dr. Khan contended at oral argument that the parties' witnesses agreed with Plaintiff's interpretation of the meaning of the CBA, but a thorough review of the testimony indicates DSU's witness made no such agreement on this topic.[7]

## B. Dr. Khan's employment at DSU

The meaning of "professional responsibilities" is important, at least in part, because Dr. Khan, in addition to his position as a faculty member, also held a supplemental paid position as the CMNST Director of IT. In that position, Dr. Khan received funding to establish and maintain a "high performance 10 GB converged IP network" used by CMNST for research, training, and education (the "CMNST Network").[8] Dr. Khan's appointment as Director of IT was separate

---

[7] Skelcher 30(b)(6) Dep. at 44-46, 124.
[8] Answer ¶ 21.

from his appointment as professor; between 2007 and 2012, Dr. Khan received annual letters of appointment identifying his salary as tenured professor and indicating that the appointment was subject to the CBA.[9] He separately received "professional employee letters of appointment" relating to his position as Director of IT.[10] In contrast to the letters of appointment relating to his position as professor, the professional employee letters of appointment sent to Dr. Khan indicate that, as Director of IT, he was to "perform the duties of that appointment as determined and set forth by the University," and he was to "faithfully perform the duties assigned and to observe the policies, rules and regulations of [DSU]."[11] None of the letters provide further detail regarding the responsibilities associated with Dr. Khan's appointment as either professor or Director of IT.

## C. The conflict between Dr. Khan and Dean Melikechi

It is apparent from the record, and the parties do not dispute, that Dr. Khan and Dean Melikechi did not see eye-to-eye on many topics. Dr. Khan disagreed with Dean Melikechi's vision for the College and chafed against what Dr. Khan perceived as Dean Melikechi "inappropriately interfering" in personnel decisions in the physics department.[12] Dr. Khan alleges that Dean Melikechi asked both Dr. Khan and another professor, Dr. Gleeson, to give up their research labs and

---

[9] App. to Pl.'s Mot. Summ. J. 146-151 (hereinafter "A").
[10] A38, A96.
[11] *Id.*
[12] Pl.'s Resp. Br. 5.

5

research equipment so it could be utilized by younger professors, but never asked younger professors to give up their labs.[13] Dr. Khan contends that Dean Melikechi falsely described an older professor, Dr. Gwanmesia, as unproductive, and Dr. Khan points out that three "older" professors all retired from CMNST in 2011 and 2012.[14] As a result of Dean Melikechi's efforts, Dr. Khan contends, the College's physics department was staffed with younger professors who were not as experienced.[15] Dr. Khan contends that Dean Melikechi's actions toward all the CMNST older professors, including Dr. Khan, reflect Dean Melikechi's bias against older employees.

Some of the tension between Dean Melikechi and Dr. Khan also revolved around the CMNST Network. Dr. Khan began developing the CMNST Network for use by the entire College in approximately 2000. Dr. Khan was the architect of the project and managed its operations, but he did not oversee the day-to-day operations. Dr. Khan's brother, Saoud Khan ("Saoud"),[16] was employed by CMNST through a series of one-year positions, through which he served as the

---

[13] Pl.'s Resp. Br. Ex. 8 at 136-137, 392 (A. Khan Dep.); Pl.'s Resp. Br. Ex. 10 at 22-23 (Gwanmesia Dep.).

[14] Pl.'s Resp. Br. Ex. 8 at 391-92 (A. Khan Dep.); Pl. Resp. Br. Ex. 10 at 23-24, 35-36 (Gwanmesia Dep.).

[15] Pl.'s Resp. Br. Ex. 10 at 9-15 (Gwanmesia Dep.); Pl. Resp. Br. Ex. 11 at 63-64 (Melikechi Dep.).

[16] I use Mr. Khan's first name to clearly distinguish him from Dr. Khan and not as a sign of disrespect.

CMNST Network manager and system administrator.[17] Dean Melikechi's predecessor allegedly supported the development of the network and helped Dr. Khan obtain funding for the project.[18] In 2008, Dean Melikechi became dean of the College. At some point in early 2012, DSU decided to integrate the CMNST Network into the larger University-wide network.

The complaint alleges that DSU initially sought to hire Saoud to modernize DSU's IT infrastructure and integrate the two networks and that Dean Melikechi sought to pressure Saoud into making that transition, but Saoud ultimately declined the offer.[19] Almost immediately thereafter, Dr. Khan alleges, Dean Melikechi terminated the students who worked the CMNST Network help desk. The following week, Dean Melikechi reassigned Saoud to another department within CMNST, removed Saoud's access to the CMNST Network, and directed Saoud that he no longer was to report to Dr. Khan and instead should report only to the chair of his new department.

On March 9, 2012, one day after reassigning Saoud and one week after terminating all the student workers for the CMNST Network, Dean Melikechi directed CMNST faculty to send all network-related requests to Dr. Khan. Dr. Khan responded that he had neither the ability nor the support personnel to respond

---

[17] Am. Compl. ¶¶ 18-20.
[18] *Id.* ¶ 22.
[19] *Id.* ¶¶ 28-34.

7

adequately to such requests. Dean Melikechi also asked Dr. Khan to provide the network's administrative passwords to members of the CMNST faculty. Dr. Khan resisted providing such passwords as a violation of network policy.

### D. The fallout

On March 12, 2012, Dr. Khan resigned as CMNST's Director of IT, asserting that he was placed in an "untenable" position by Dean Melikechi's decisions.[20] Dean Melikechi accepted Dr. Khan's resignation, acknowledged receipt of the passwords and keys to the network rooms transmitted from Dr. Khan, and indicated DSU IT personnel would take control of the network.

For a period of three or four days, however, no one oversaw the CMNST Network. The reasons for this gap are not apparent from the current record. During this period, Dean Melikechi distributed administrative passwords to faculty who requested such. Meanwhile, DSU IT personnel made several requests to Dr. Khan for information regarding the CMNST Network.

For example, in a series of e-mails on March 13, 2012, Arthur Leible, Ph.D., the Associate Vice President of Information Technology for DSU ("Dr. Leible"), sent Dr. Khan a list of information Dr. Leible required in order to transition the CMNST Network into DSU's network.[21] Dr. Khan responded that he had resigned his position and no longer had access to the requested information. Dean

---

[20] A58.
[21] Defs.' Opening Br. Supp. Mot. Summ. J. Ex. 10.

Melikechi then responded and demanded that Dr. Khan provide the information Dr. Leible requested, asserting that Dr. Khan's resignation did not render him unable to provide the information.[22] Dr. Khan responded and reiterated that he could not provide the requested information, further suggesting that Saoud was the person responsible for software and that the information likely could be found in his office.[23] During this critical week, Saoud was ill and away from the office. Saoud was terminated by the University on March 20, 2012.[24]

So began a flurry of e-mails and written communications that escalated with a fervor I doubt any of the participants anticipated. On March 16, 2012, the CMNST Network began exhibiting issues and ultimately crashed.[25] That same day, without informing Dr. Khan of the issues with the network, Dean Melikechi asked Dr. Khan to provide passwords to the CMNST Network Cisco switches. Dr. Khan indicated he did not previously manage those switches and suggested DSU IT personnel perform the Cisco password recovery to reset the passwords. On March 17th, Dean Melikechi renewed his demand for the initial list of information requested by Dr. Leible, stating that such information should be provided by

---

[22] *Id.*
[23] *Id.*
[24] Defs.' Opening Br. Supp. Mot. Summ. J. Ex. 22 at 4.
[25] Defs.' Opening Br. Supp. Mot. Summ. J. Exs. 9-13.

March 19th at 3:00 p.m.[26] Dr. Khan again responded that he had resigned his position, provided all passwords and keys, and could not assist any further.[27]

Dr. Khan then sought the intervention of DSU Provost Alton Thompson, Ph.D. ("Provost Thompson"), asking Provost Thompson to, in essence, "call off" Dean Melikechi's pursuit of the information from Dr. Khan. Dr. Khan maintained that he had provided all the information in his possession or control and therefore he could not provide any additional assistance to Dean Melikechi. Provost Thompson acknowledged Dr. Khan's "comments" but indicated Dr. Khan should fully comply with Dean Melikechi's request.[28]

Thomas Preston, General Counsel for DSU, next sent Dr. Khan a letter demanding that he immediately turn over the same list of information initially requested on March 13th. Mr. Preston's letter indicated failure to so respond would "be considered insubordination, a failure to perform professional responsibilities, serious personal misconduct[,] and a deliberate and serious violation of the rights of other members of [CMNST] and [DSU]."[29] This language calls upon the bases for discharge listed in Section 10.4.3 of the CBA.

On March 20, 2012, Dr. Khan sent a letter to Mr. Preston providing background regarding the dispute between Dean Melikechi and Dr. Khan. Dr.

[26] Defs.' Opening Br. Supp. Mot. Summ. J. Ex. 13.
[27] *Id.*
[28] Defs.' Opening Br. Supp. Mot. Summ. J. Ex. 19.
[29] Defs.' Opening Br. Supp. Mot. Summ. J. Ex. 16.

Khan then went on to respond to each of the twelve items requested "to the best of [his] ability."[30] The record reflects that, before responding to Mr. Thompson, Dr. Khan called Saoud to request the information, but Saoud was still out of the office for medical reasons and did not have access to the CMNST Network. As a result, most of Dr. Khan's responses to the information requests indicated that Saoud was the person who was tasked with the day-to-day operation of the CMNST Network and would have the information requested. For some of the requests, Dr. Khan recreated diagrams and otherwise indicated from whom the requested information could be obtained.[31] Most notably for purposes of this lawsuit, Dr. Khan indicated in response to a request for logical and physical diagrams of the network that he had deleted such diagrams when he resigned his post as IT Director. When he issued his response on March 20th, Dr. Khan also conveyed logical and physical diagrams that he had recreated.

Within 30 minutes of sending his response, Dr. Khan received a letter from Provost Thompson stating that Dr. Khan was being placed on paid administrative leave, effective immediately, because DSU had "evidence that [Dr. Khan] intentionally sabotaged the [CMNST Network], and as a result, [he had] substantially interfered with the ability of the entire faculty of that College to

---

[30] Defs.' Opening Br. Supp. Mot. Summ. J. Ex. 19 at 3.
[31] *Id*. at 3-5.

perform their duties and responsibilities."[32]  The letter also stated that Dr. Khan's conduct violated Article 10 of the CBA.

### E. The investigation

Although Provost Thompson's March 20th letter cites "evidence" that Dr. Khan intentionally sabotaged the CMNST Network, DSU conceded in this litigation that it did not then, and does not now, have evidence that Dr. Khan sabotaged the network or otherwise intentionally caused it to crash on March 16, 2012.[33]  DSU hired Brandywine Technology ("Brandywine") to restore the network, but the University never formally investigated the "root cause" of the network crash.  Brandywine was engaged on March 19, 2012, and its report dated March 28, 2012 states: "The determination was made [that] additional root cause analysis should be postponed to expedite efforts and restore functionality to the affected user community."[34]  Although DSU considered engaging another company, ParaLogic, to conduct a root cause investigation, DSU ultimately did not pursue that investigation.[35]

The University did, however, conduct a formal investigation "of the system failure," including "a review of Sections 10.4.3 A., D., and E[.] of the [CBA] as it

---

[32] Defs.' Opening Br. Supp. Mot. Summ. J. Ex. 20.
[33] Pl.'s Resp. Br. Ex. 9 at 69, 70, 85, 94, 135 (Thompson Dep.); A336 (Leible Dep.).
[34] Defs.' Opening Br. Supp. Mot. Summ. J. Ex. 21.
[35] A341-42. Based on a phone call with Dr. Amir, ParaLogic produced a draft report and a bid for the cost to perform the investigation.

relates to [Dr. Khan], to determine if he violated any of those provisions."[36] Assistant Provost Bradley Skelcher, Ph.D. ("Dr. Skelcher") and Internal Auditor Ed Watson conducted the investigation, which included a meeting with Dr. Khan and his AAUP representative, Dr. Steve Newton, on May 25, 2012. During that meeting, in response to questions posed by the investigators, Dr. Khan informed the investigators that there was backup storage of the CMNST Network and that, although Dr. Khan did not have the expertise to access the backup, Saoud would know how to find it.[37]

Dr. Skelcher and Mr. Watson issued their report on June 5, 2012 (the "Skelcher Report").[38] The Skelcher Report catalogs a series of problems Brandywine identified with the CMNST Network. Specifically, the Skelcher Report concludes that the CMNST Network: (1) did not conform to best practices because network staff utilized the built-in administrator account rather than creating individual administrator accounts for staff, (2) lacked server backups, making restoring the network difficult, (3) had underutilized, misconfigured, or non-functioning infrastructure equipment, and (4) lacked redundancy in the event of hardware failure.[39] Calling upon both the Brandywine data and a draft report and bid prepared by ParaLogic, the Skelcher Report repeatedly suggests that the

---

[36] Defs.' Opening Br. Supp. Mot. Summ. J. Ex. 22 at 1.
[37] A561-63 (Skelcher Dep.).
[38] Defs.' Opening Br. Supp. Mot. Summ. J. Ex. 22.
[39] *Id*. at 2.

March 19, 2012 network failure was not an accident and was the result of deliberate acts by an unnamed individual.[40] The report goes on to describe the repeated requests lodged by Dr. Leible, Dean Melikechi, and Provost Thompson seeking information from Dr. Khan in the week after his resignation as Director of IT. The penultimate paragraph of the Skelcher Report contains the following condemnation of Dr. Khan's conduct:

> [T]he system was not secure according to two reports making it vulnerable to acts that produced the system failure during the week of Dr. Khan's resignation. With the system failure, it was Dr. Khan's responsibility to cooperate and provide assistance to the University in restoring and maintaining operations of the system as it transitioned to the University IT regardless of whether he resigned from his position or not. Dr. Khan was still an employee of the University as a professor. Furthermore, his appointment to the University in part was as Director of IT along with teaching responsibilities. Therefore, according to 10.4.3 A of the CBA, Dr. Khan's "failure to perform professional responsibilities either through incompetence, persistent negligence, refusal to carry out reasonable assignments, or disregard for or failure to meet . . . professional standards and ethics" led either directly or indirectly to the failure of the IT system in CMNST. His response to requests by University officials demonstrates "serious personal misconduct of such a nature as to warrant and evoke the condemnation of the academic community" as outlined in 10.4.3 E of the CBA.[41]

Dr. Skelcher and Mr. Watson recommended that DSU "consider appropriate disciplinary action" under Section 10.4.4 of the CBA.[42]

---

[40] *Id*. at 2-3.
[41] *Id*. at 5.
[42] *Id*.

14

**F. Dr. Khan's suspension and termination**

Two weeks after the Skelcher Report was issued, Provost Thompson sent Dr. Khan a letter stating that, based on the results of the investigation, he was convinced that DSU would pursue Dr. Khan's discharge from employment for "Just Cause." As required by Section 10.4.4 of the CBA, Provost Thompson invited Dr. Khan to discuss the matter before DSU issued a formal notice of intent to impose discipline.

Dr. Khan and his AAUP representative, Dr. Newton, met with Provost Thompson on September 5, 2012. Although the meeting was billed as an opportunity for discussion before any formal discipline was imposed, at the beginning of the meeting, Provost Thompson handed Dr. Khan a letter indicating he permanently was discharged from the University. Dr. Newton then challenged the grounds for termination, asserting that discharging a tenured faculty member for actions allegedly taken in connection with a supplemental appointment was not proper and likely would have a chilling effect on faculty members' willingness to accept such supplemental appointments in the future. It was at this meeting that Provost Thompson raised the issue of the purported absence of any backup of the CMNST Network. Dr. Khan indicated such a backup did, in fact, exist. Provost Thompson apparently believed, erroneously DSU now concedes, that this September meeting was the first time Dr. Khan revealed the backup's existence. In

fact, as DSU's witnesses now acknowledge, Dr. Khan told Dr. Skelcher and Mr. Watson about the backup during their meeting in May 2012.[43]

At the conclusion of the September 5th meeting, Provost Thompson agreed to consider Dr. Newton's arguments and stated he would issue a new letter in the next few days.[44] Provost Thompson then issued a letter dated September 20, 2012 indicating that Plaintiff was suspended without pay, effective September 17, 2012 until December 31, 2012, while the University continued to investigate the "seriously disturbing allegations of failure to perform professional responsibilities either through incompetent or persistent negligence" that lead to the CMNST Network crash.[45]

In mid-December, Provost Thompson asked Dr. Khan to meet with him on January 15, 2013 "before issuing you my formal notification of intent to impose discipline as outlined in 10.4.4. of the CBA."[46] It was at this meeting that Dr. Khan received his letter of discharge. Defendants insist that Provost Thompson made the decision to discharge Dr. Khan and that Dean Melikechi had no say in that decision. The record, however, reflects facts indicating that Dean Melikechi

---

[43] A562-64 (Skelcher Dep.). DSU disputes whether Dr. Khan did enough to help DSU locate and utilize the backup(s).

[44] When no new letter was received, Dr. Khan demanded arbitration so as not to miss the ten-day period to do so under the CBA.

[45] A98. Dr. Khan again demanded arbitration. DSU did not respond to that demand.

[46] A103.

actively was involved in the process leading up to Dr. Khan's discharge and that Provost Thompson deferred to Dean Melikechi's decisions or recommendations.

For example, Dr. Thompson testified that he viewed the Dean as the "CEO of the College" and tried to keep "College level decisions at the College level."[47] Provost Thompson trusted Dean Melikechi's judgments, viewed him as an effective dean, and could not point to an instance in which he overrode one of Dean Melikechi's recommendations.[48] Consistent with that theme, Provost Thompson acceded to Dean Melikechi's request to replace Dr. Khan temporarily when he was placed on administrative leave in March 2012 **and** to begin immediately the search for Dr. Khan's permanent replacement, even though ostensibly no decision to discharge Dr. Khan had been made at that point.[49] When Provost Thompson approved the request to begin searching for Dr. Khan's replacement, Dean Melikechi responded: "You are simply the best boss/colleague I have ever worked with. Thank you," to which Provost Thompson replied: "The feeling is definitely mutual."[50]

In early January 2013, as he was drafting Dr. Khan's letter of discharge, Provost Thompson sent a draft to Dean Melikechi, Mr. Preston, and Dr. Skelcher,

---

[47] Pl.'s Resp. Br. Ex. 9 at 20-22 (Thompson Dep.).

[48] *Id.* at 16-18, 31-32, 41.

[49] Pl.'s Resp. Br. Ex. 4 at DSU_000122, 129, 130. During the summer of 2012, Dean Melikechi also distributed Dr. Khan's research equipment, lab, and office to other faculty members. Pl.'s Resp. Br. Ex. 10 at 32-33 (Gwanmesia Dep.); Pl.'s Resp. Br. Ex. 11 at 456-59 (Melikechi Dep.).

[50] Pl.'s Resp. Br. Ex. 4 at DSU_000122.

17

seeking their "review and comment."[51]  Dean Melikechi indicated his approval of the draft and opined that "Dr. Khan's brought this on himself.  His desire to take the University hostage back fired on him and his brother."[52]  Provost Thompson then tasked Dean Melikechi with delivering the discharge letter to Dr. Khan at the January 15, 2013 meeting.  Provost Thompson did not actually attend that meeting.  Instead, Dean Melikechi appeared and immediately handed Dr. Khan the letter notifying him that he permanently was discharged from the DSU faculty.[53]

The letter indicates Dr. Khan was discharged under Sections 10.4.3A and E of the CBA.  The alleged conduct that DSU contends amounted to "Just Cause" under those sections fairly may be summarized as follows: Dr. Khan (1) refused to carry out reasonable assignments that contributed substantially to the network crash and (2) failed to respond to reasonable requests to provide information to restore the network.[54]  The discharge letter summarized the findings of Brandywine and ParaLogic (although DSU now concedes ParaLogic neither was retained nor performed an independent investigation) regarding the CMNST Network's creation and its alleged failings.  The letter also refers to Dr. Khan's alleged failure to provide network documentation and his deletion of the logical and physical

---

[51] Pl.'s Resp. Br. Ex. 4 at DSU_001031.
[52] *Id*.
[53] Answer ¶ 83.
[54] Defs.' Opening Br. Supp. Mot. Summ. J. Ex. 27.

diagrams for the network when he resigned from his post as IT Director.[55] The letter concludes that (1) the Brandywine and ParaLogic reports, as well as DSU's internal investigation, indicate Dr. Khan failed to perform his professional responsibilities, leading to the network crash, and (2) his lack of responsiveness and professional ethics contributed to the nature and magnitude of the network downtime and attendant consequences. Finally, the letter refers to Dr. Khan's "admission" that he failed to inform anyone that backup data existed which would substantially have ameliorated the consequences of the network crash.[56]

**G. The arbitration**

Dr. Khan demanded arbitration shortly after he received notice of his discharge.[57] Although arbitration under the CBA is intended to be a rapid process, Dr. Khan's arbitration proceeded in fits and starts for reasons that are disputed and not directly related to the pending motions for summary judgment. Arbitration eventually was scheduled to begin on October 29, 2013. Five days before the evidentiary hearing, Dr. Khan withdrew his arbitration demand.

**H. This lawsuit**

Seven months later, Dr. Khan filed this action, claiming that: (1) his suspension and discharge violated the CBA; (2) his discharge was a violation of

---

[55] *Id.*
[56] *Id.*
[57] A108.

19

the Delaware Discrimination in Employment Act ("DDEA") and the federal Age Discrimination in Employment Act ("ADEA"); and (3) Dean Melikechi intentionally and tortiously interfered with his contract and business expectations.[58] DSU filed a counterclaim alleging Dr. Khan's withdrawal from the arbitration process on the eve of the hearing amounted to bad faith and vexatious litigation tactics.

This action was scheduled for trial on November 6, 2015. The parties filed the pending motions for summary judgment in September 2015, and the trial date ultimately was vacated. The Court heard argument on the pending motions on March 17, 2016 and, based on statements made during oral argument, requested the complete transcripts for Dr. Skelcher's depositions. Those transcripts were filed on March 22, 2016.

## ANALYSIS

Summary judgment should be awarded if "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[59] When considering a motion for summary judgment, the evidence and the inferences drawn from the evidence

---

[58] The claim against Dean Melikechi was added in Dr. Khan's amended complaint, filed on July 28, 2014.

[59] Super. Ct. Civ. R. 56(c).

are to be viewed in the light most favorable to the nonmoving party.[60] The Court will accept "as established all undisputed factual assertions . . . and accept the non-movant's version of any disputed facts. From those accepted facts[,] the [C]ourt will draw all rational inferences which favor the non-moving party."[61] A party seeking summary judgment bears the initial burden of showing that no genuine issue of material fact exists.[62] If the movant makes such a showing, the burden then shifts to the non-moving party to submit sufficient evidence to show that a genuine factual issue, material to the outcome of the case, precludes judgment before trial.[63]

Dr. Khan contends he is entitled to summary judgment on Counts I and II of the amended complaint, as well as on DSU's counterclaim for bad faith or vexatious litigation tactics. Counts I and II of the amended complaint relate to Dr. Khan's claims that his suspension without pay and discharge violated the terms of the CBA. For their part, Defendants contend they are entitled to summary judgment as to Counts III, IV, and V of the amended complaint. Counts III and IV relate to Dr. Khan's claim that his discharge violated the Delaware Discrimination in Employment Act ("DDEA") and the federal Age Discrimination in Employment

---

[60] *Brzoska v. Olson*, 668 A.2d 1355, 1364 (Del. 1995); *Judah v. Del. Trust Co.*, 378 A.2d 624, 632 (Del. 1977).

[61] *Marro v. Gopez*, 1994 WL 45338, at *1 (Del. Super. Jan 18, 1994) (citing *Merrill v. Crothall-Am., Inc.*, 606 A.2d 96, 99-100 (Del. 1992)).

[62] *Moore v. Sizemore*, 405 A.2d 679, 680-81 (Del. 1979).

[63] *Id*.; *see also Brzoska*, 668 A.3d at 1363.

Act ("ADEA"), respectively. Count V is Dr. Khan's claim against Dean Melikechi for tortious interference with contract and business expectancy. Each side disputes that the other is entitled to summary judgment. In my view, disputed issues of fact preclude summary judgment as to all claims except DSU's counterclaim for bad faith.

## I. Dr. Khan is not entitled to summary judgment on his claims under the CBA.

In support of his contention that he is entitled to summary judgment for his claims arising under the CBA,[64] Dr. Khan argues that DSU violated the CBA by (1) suspending and discharging him as a tenured professor for alleged misconduct in a supplemental administrative position, (2) suspending and discharging him without substantiating the charges against him, and (3) subjecting him to institutional double jeopardy. DSU argues that disputed issues of material fact preclude summary judgment as to the first two issues and that Dr. Khan was not subjected to institutional double jeopardy. I address each issue in turn.

## A. Whether DSU suspended and discharged Dr. Khan for actions taken in connection with his service as a tenured professor is a disputed issue of fact for the jury.

Dr. Khan first argues that DSU violated the CBA by discharging him for actions taken in his role as IT Director, rather than in his role as a tenured faculty

---

[64] Dr. Khan's motion indicates he seeks summary judgment on both Counts I and II of the amended complaint, but at oral argument Dr. Khan conceded that his motion only addressed Count II. I therefore have confined my analysis to Count II.

22

member. Dr. Khan asserts that, under the terms of the CBA, just cause for disciplining a tenured faculty member must be based on "charges directly and substantially related to the fitness of the affected unit member to perform professional responsibilities."[65] It is here that the meaning, and apparent ambiguity, of the term "professional responsibilities" becomes important. Dr. Khan argues that "professional responsibilities" in Section 10.4.3 of the CBA refers to Section 12.2, which defines the term "Academic Load." He further contends that the parties are in agreement that a professor's "Academic Load" is identified in his or her letter of appointment, and Dr. Khan's letter of appointment for his position as a professor made no mention of his position as IT Director. Dr. Khan therefore concludes that his service as such cannot fall within the definition of "Academic Load" or, by extension of reasoning, "professional responsibilities."

DSU argues, on the other hand, that Dr. Khan was not disciplined for his actions as IT Director, but rather for his actions and inactions after he resigned from that position. DSU argues that, after he resigned as IT Director, Dr. Khan continued to serve as a member of the faculty and, in that role, had an obligation to assist the University, maintain professionalism, and carry out reasonable assignments. DSU contends Dr. Khan's "evasive" and "unhelpful" responses to the administration's requests for information regarding the CMNST Network failed

---

[65] CBA § 10.4.2.

to live up to his obligations and contributed to the magnitude of the network downtime. According to DSU, this conduct violated both 10.4.3A of the CBA, because it was a "failure to perform professional responsibilities either through incompetence, persistent negligence, [or] refusal to carry out reasonable assignments," and 10.4.3E, because it amounted to "serious personal misconduct of such a nature as to warrant and evoke the condemnation of the academic community."

As an initial matter, it is unclear to me whether the parties contend the use of the term "professional responsibilities" in the CBA is ambiguous. The parties did not present the argument as such, but they also did not squarely address the issue at all. In my view, the term likely is ambiguous. Plaintiff strongly contends that the term "professional responsibilities" means "Academic Load," and offers citations to testimony to support that contention, but there is nothing in the four corners of the CBA that compels that conclusion, let alone that suggests it is the only reasonable interpretation of the term.[66] In addition, it is reasonable to conclude the terms "professional responsibilities" and "Academic Load" mean different things, if for no other reason than the drafters chose different terms and specifically defined only one such term. Although the issue is not expressly addressed in its briefs, DSU appears to contend that "professional responsibilities" should be

---

[66] By citing parol evidence in support of his proffered interpretation of the CBA, Dr. Khan effectively concedes the ambiguity of the agreement.

24

interpreted more broadly than "Academic Load." DSU does not, however, articulate how it believes the term should be defined. In view of the undeveloped record on this point, I cannot award summary judgment. Rather, further proceedings are necessary: first, the parties must squarely present to the Court the issue of whether "professional responsibilities" is ambiguous. In the event I conclude the term is ambiguous, resolution of that ambiguity is a question for the jury.[67]

As a result of that interpretive issue, the additional factual question of whether DSU had just cause to discipline Dr. Khan under Section 10.4.3A of the CBA cannot be resolved at this point. Depending on how "professional responsibilities" is interpreted, the factual question of whether Dr. Khan failed to perform those responsibilities when he responded to the administration's requests for information and assistance is one that will require resolution. If, as Dr. Khan contends, "professional responsibilities" has the same meaning as "Academic Load," it may be that he is entitled to summary judgment on the narrow issue of whether his discipline was permitted under Section 10.4.3A. I decline to address that hypothetical issue at this stage. If, on the other hand, "professional responsibilities has some other, broader meaning, the jury will need to determine

---

[67] *Scott v. Bosari*, 1994 WL 682615, at *5 (Del. Super. Oct. 26, 1994) ("Although the jury resolves an ambiguity once its presence in an instrument is established, it is the court who makes the initial determination as to whether an ambiguity exists."); *see also Bochniak v. Blenheim at Bay Pointe, LLC*, 2011 WL 2184180, at *9 (Del. Super. May 31, 2011); *Smith v. Berwin Builders, Inc.*, 287 A.2d 693, 695 (Del. Super. 1972).

whether DSU's evidence, and its contention that Dr. Khan was evasive and unhelpful in his responses during the critical week in March, amounts to a failure to perform his responsibilities. In addition, DSU also contends Dr. Khan's conduct violated Section 10.4.3E. Again, the jury must make the factual determination of whether Dr. Khan did everything he reasonably could do in responding to the administration's requests and, if he did not, whether his responses amounted to personal misconduct "of such a nature as to warrant and evoke the condemnation of the academic community." That question likely will turn on an evaluation of the testimony and credibility of the witnesses, which is not the function of this Court on a motion for summary judgment.

Finally, the cases Dr. Khan cites in support of his argument on this point are not persuasive. *Spurlock v. Board of Trustees*, a Wyoming Supreme Court decision, required the court to determine, among other things, whether an individual who was both a tenured classroom teacher and a non-tenured principal could be discharged as a classroom teacher for conduct taken as a principal. Interpreting the Wyoming tenure statute, the court in *Spurlock* concluded the teacher could not be dismissed because the Wyoming statute regarding "just cause" required a finding of "facts which bear a [relationship] to the teacher's ability and

fitness to teach and discharge the duties of his or her position."[68]  Because

*Spurlock* is interpreting the Wyoming statutory definition of "just cause," it is of

questionable value in this case, which requires application of the contractual "Just

Cause" standard, itself requiring interpretation and application of, at a minimum,

the term "professional responsibilities."  Dr. Khan cannot engraft the Wyoming

statutory definition of "just cause" into the CBA.

The other case Dr. Khan cites, *Durham v. Fields*, aptly supports the

proposition that a tenured teacher cannot be discharged from a teaching position

*solely* for actions taken in a supplemental administrative position.[69]  The question

presented by this case, however, is more nuanced.  That is, DSU does not appear to

argue that it could discharge Dr. Khan as a professor for his alleged failings as an

IT Director.  Rather, DSU argues that it discharged Dr. Khan for his conduct ***after***

he resigned as IT Director, but while he remained employed by DSU as a

professor.  Again, the basis for the discipline and whether it amounted to just cause

is a disputed factual issue, but nothing in *Durham* compels summary judgment in

Dr. Khan's favor.

---

[68] 699 P.2d 270, 276 (Wyo. 1985) (quoting *Monahan v. Bd. of Trustees*, 486 P.2d 235, 237 (Wyo. 1971)).
[69] 588 A.2d 352 (Md. Ct. Spec. App. 1991).

**B. The question of whether the charges against Dr. Khan were substantiated is a disputed factual issue that cannot be resolved on summary judgment.**

Dr. Khan also argues that his suspension and ultimate discharge violated the CBA because DSU did not base the discipline on "substantiated charges" as required by Section 10.4.2. Although Dr. Khan's original suspension with pay was based on allegations that he somehow intentionally caused the CMNST Network to crash, and allusions to such intentional misconduct continued in his discharge letter and even in DSU's response to the motion for summary judgment, DSU concedes it does not have any evidence substantiating such charges.[70] DSU further conceded during oral argument that Dr. Khan could not be disciplined as a tenured professor for actions he took in his role as Director of IT. Finally, DSU's witnesses concede the error in Provost Thompson's statement in the discharge letter that Dr. Khan did not inform the investigators or the administration of the existence of backup data.[71] Accordingly, the only charges referenced in Dr. Khan's discharge letter that DSU contends were substantiated charges giving the University "Just Cause" to discharge Dr. Khan were that his responses to the administration's requests for

---

[70] Pl.'s Resp. Br. Ex. 9 at 69, 70, 85, 94, 135 (Thompson Dep.); A336 (Leible Dep.). I caution DSU that, at any trial in this matter, it will not be permitted to suggest to the jury, overtly or otherwise, that Dr. Khan caused the network to crash. Given the allusion to such in the documents that likely will be admitted into evidence, an instruction will be given to the jury to the effect that the parties stipulate that there is no evidence that Dr. Khan intentionally caused the network to crash.

[71] A563 (Skelcher Dep.).

assistance and information between March 13th and March 19, 2012 amounted to violations of Sections 10.4.3A and E.[72]

Dr. Khan contends that the record is undisputed that he responded to every request for information posed to him between March 13th and March 19th, and that DSU has come forward with no evidence that he had the information sought by the administration but failed to provide it. Were that an accurate summary of the evidence, Dr. Khan would be entitled to judgment as a matter of law. The facts, however, are not nearly so clear. DSU points to evidence, including both its internal investigation and the Brandywine report, indicating that a person in Dr. Khan's role should have had the requested information, or should easily have been able to recreate it.[73] Moreover, Dr. Khan concedes that he deleted certain information, namely logical and physical diagrams of the network, when he resigned his post as IT Director, that such information was requested by the administration on March 13, 2012, and that it was not until March 20, 2012 that Dr. Khan provided the diagrams, which he was able to "recreate." It was also not until March 19th or 20th that Dr. Khan contacted his brother in an attempt to

---

[72] Dr. Khan asserted that Provost Thompson "admitted at his deposition that Dr. Khan's alleged insubordination, standing alone, would not have justified his termination, and that Dr. Khan was terminated based on the unfounded belief that he somehow caused the network to fail." Pl.'s Resp. Br. at 24. The pages of Provost Thompson's deposition cited for this proposition in fact state the precise opposite; Provost Thompson agreed there was no evidence that Dr. Khan sabotaged the network, but testified that Dr. Khan's insubordination impacted the work of the faculty and staff and "affected the ability of the University to get the network back up or to avoid the network crash." Pl.'s Resp. Br. Ex. 9 at 144-46 (Thompson Dep.).
[73] Defs.'s Ans. Br. Ex. K at 152-56 (Catranis Dep.).

obtain the information the administration sought. Those disputed facts create an issue for the jury regarding whether the charges against Dr. Khan were "substantiated" under the CBA.

### C. Dr. Khan was not subjected to industrial double jeopardy.

Dr. Khan also invokes the doctrine of industrial double jeopardy as a basis for his claim that his discharge was improper. Industrial double jeopardy, a subset of "industrial due process," is an "esoteric area of labor relations law" that "enshrines the idea that an employee should not be penalized twice for the same infraction."[74] The principle applies only where a final decision on the merits of a sanction has been made and the sanction or penalty subsequently is increased.[75] As the First Circuit explained in one of the few reported decisions discussing the concept, "a second sanction only transgresses industrial double jeopardy principles if the first sanction has become final. . . . The authorities are consentient that when employers suspend employees pending investigation of alleged misconduct, the doctrine of industrial double jeopardy does not bar subsequent discipline."[76] *Zayas*

---

[74] *Zayas v. Bacardi Corp*., 524 F.3d 65, 66, 69 (1st Cir. 2008).

[75] *Id.* at 69 (1st Cir. 2008) (citing 1 Tim Bornstein et al., *Labor & Employment Arbitration* § 15.07[2] (2d ed. 1997)).

[76] *Zayas*, 524 F.3d at 69 (citing 1 Tim Bornstein et al., *Labor & Employment Arbitration* § 15.07[2] (2d ed.1997); Alan Miles Ruben, *Elkouri & Elkouri: How Arbitration Works* § 15.3.F.vi, at 981 (6th ed.2003); *Misco Precision Casting Co.,* 40 Lab. Arb. 87, 90 (1962) (Dworkin, Arb.)).

*v. Bacardi Corp.*,[77] which Dr. Khan cites as a correct recitation of the law, recognizes that Dr. Khan's discharge, after his suspension without pay, did not run afoul of industrial due process principles because there is no suggestion in the record that Dr. Khan's suspension was a "final" sanction.

To the contrary, the undisputed record indicates that Dr. Khan was told that he was being suspended without pay pending further consideration and investigation by DSU of the appropriate sanction. This suspension was imposed because Dr. Khan challenged the propriety of Provost Thompson's decision to discharge Dr. Khan in September 2012. Wanting the opportunity to take Dr. Khan's contentions into account, Provost Thompson indicated that Dr. Khan would be suspended without pay "while we contemplate imposing more severe disciplinary action."[78] After further deliberation, Provost Thompson decided discharge was the appropriate sanction. Dr. Khan can point to nothing in the record suggesting that the suspension without pay was a final sanction or that Dr. Khan could have understood it as such.

Dr. Khan argues that his discharge after suspension must have constituted double jeopardy because the suspension period ended and he was restored to the DSU payroll for two weeks before being discharged. Again, however, there is nothing in the record indicating that the suspension without pay was a final

---

[77] 524 F.3d 65.
[78] A99.

sanction, as opposed to a suspension during an ongoing investigation, which the authorities indicate does not violate industrial due process. Finally, Dr. Khan points out that DSU did not conduct any additional investigation during the three month suspension period. Accepting that fact as true, however, does not change the landscape. Provost Thompson suspended Dr. Khan to give himself time to deliberate in response to legal arguments and interpretations of the CBA raised by Dr. Khan and his representative. A suspension while an employer explores the legal parameters of a decision is, in my view, equivalent to a period for factual investigation. To conclude otherwise would discourage deliberate decision-making by employers.

## II. Dr. Khan is entitled to summary judgment on DSU's counterclaim.

Dr. Khan contends he is entitled to summary judgment on DSU's "bad faith" counterclaim because DSU has offered no authority or evidence supporting its claim. DSU argues there are disputed issues of fact regarding Dr. Khan's reasons for withdrawing from the arbitration on the eve of the hearing and that those disputed facts require resolution by a jury. Significantly, however, DSU proffers neither authorities recognizing bad faith in an arbitration process as a cognizable cause of action, nor a description of the necessary elements of such a claim.[79] This

---

[79] The only case DSU cites, *Stoltz Realty Co. v. Raphael*, 458 A.2d 21 (Del. 1983), stands for the unremarkable proposition that a litigant who elected to pursue arbitration, and ultimately lost in arbitration, could not later pursue his claim in a separate lawsuit in this Court. The Delaware Supreme Court applied principles of estoppel, election of remedies, and *res judicata* in affirming

failing alone justifies entry of judgment in Dr. Khan's favor.[80]   In addition, although DSU contends there are factual disputes regarding Dr. Khan's proffered reasons for withdrawing from the arbitration, DSU has provided no evidence, whether by affidavit or otherwise, suggesting that Dr. Khan's explanations are disputed.  The mere suggestion that Dr. Khan's credibility may be in question does not suffice to create an issue of material fact.[81]   DSU also failed to produce in discovery, or submit in response to the motion for summary judgment, any evidence of damages the University incurred as a result of Dr. Khan's alleged bad faith.  Dr. Khan therefore is entitled to summary judgment on the counterclaim.

### III. DSU is not entitled to summary judgment on Dr. Khan's statutory age discrimination claims.

In its motion for partial summary judgment, DSU argues that Dr. Khan's claims under the DDEA and the ADEA[82] fail as a matter of law because (1) the theory pleaded in the complaint does not amount to age discrimination and (2) there is no evidence that Dr. Khan was discriminated against on the basis of his

---

the dismissal of the lawsuit.  *Id.* at 22-23.  Nothing in *Stoltz Realty* suggests that Delaware recognizes an independent cause of action for bad faith litigation tactics.

[80] To defeat a motion for summary judgment on a claim for which the non-moving party bears the burden of proof, the non-moving party must put forward some evidence to support each element of the claim.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  Here, DSU cannot even identify the elements of the claim, let alone point to evidence in support of each element.

[81] Super. Ct. Civ. R. 56(e) ("When a motion for summary judgment is made and supported as provided in this Rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this Rule, must set forth specific facts showing that there is a genuine issue for trial.").

[82] 19 *Del. C.* §§ 710-719A; 29 U.S.C. § 621.

age. Dr. Khan contends summary judgment is not appropriate because the theory on which he is pursuing his age discrimination claims has shifted since the complaint was filed and because there is ample evidence from which a jury could conclude DSU discriminated against Dr. Khan when he was discharged from his employment. For the reasons that follow, I conclude DSU is not entitled to summary judgment on these claims, which are Counts III and IV of the amended complaint.

## A. Dr. Khan is not pursuing the theory that he was discharged to prevent vesting of his early retirement benefits.

DSU first argues that it is entitled to summary judgment on Counts III and IV of the amended complaint because the complaint alleges DSU violated the DDEA and the ADEA by discharging Dr. Khan "to prevent him from obtaining early retirement benefits."[83] Both statutory schemes preclude an employer from discriminating against an employee on the basis of age.[84] DSU correctly points out, however, that claiming an employer terminated an employee to prevent retirement benefits from vesting does not amount to an age discrimination claim under the ADEA.[85]

Dr. Khan disputes neither that settled legal principle nor its application to claims under both the ADEA and the DDEA. Rather, Dr. Khan argues he was

---

[83] Am. Compl. ¶ 115; s*ee also id.* ¶¶ 120, 133, 138.
[84] 19 *Del. C.* § 711(a)(1); 29 U.S.C. § 623(a).
[85] *Hazen Paper Co. v. Biggins*, 507 U.S. 604 (1993).

discharged on the basis of his age and that DSU's proffered reasons for the discharge merely were pretextual. In other words, Dr. Khan's theory as to why DSU's conduct amounted to violations of the ADEA and the DDEA has shifted since the amended complaint was filed. Because Delaware is a notice pleading state, however, that shift is not necessarily fatal to Dr. Khan's claims. Notice pleading only requires that a plaintiff put a defendant on fair notice in a general way of the cause of action asserted.[86] The rules do not bar a plaintiff from shifting or augmenting a theory after a complaint is filed, provided that the other party is not prejudiced by the shift. As a leading treatise interpreting the federal notice pleading standard explained,

> The federal rules, and the decisions construing them, evince a belief that when a party has a valid claim, he should recover on it regardless of his counsel's failure to perceive the true basis of the claim at the pleading stage, provided always that a late shift in the thrust of the case will not prejudice the other party in maintaining a defense upon the merits. Undoubtedly cases can be imagined in which an alteration in legal theory would work to the prejudice of the opposing party . . . . in the vast majority of cases, any temporary prejudice that might be caused by a shift in legal theory can be overcome by permitting additional time for discovery or by granting a continuance if the case has reached trial.[87]

DSU has not articulated any prejudice by Dr. Khan's pivot away from the retirement benefits theory, nor do I perceive any based on the record before me. If

---

[86] *Michelson v. Duncan*, 407 A.2d 211, 217 (Del. 1979); *Erect-Rite Const. Co. v. DeChellis*, 193 A.2d 545, 548 (Del. Super. 1963).
[87] 5 Wright & Miller, Fed. Prac. & Proc. Civ. § 1219 (3d ed. 2016).

DSU requires limited additional discovery as a result of this shift, I certainly will entertain a motion on that issue.

## B. Dr. Khan has adduced sufficient evidence from which a jury reasonably could conclude DSU violated the DDEA and the ADEA.

DSU alternatively argues that Dr. Khan's claims of age discrimination lack evidentiary support and that summary judgment also must be granted on that basis. Claims under the ADEA are governed by a three-step burden-shifting framework articulated by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*.[88] Under long-standing Delaware Supreme Court precedent, the *McDonnell Douglas* framework also applies to claims under the DDEA.[89] The framework first requires a plaintiff to present a *prima facie* case of age discrimination by demonstrating he (1) is over 40 years old, (2) is qualified for the position in question, (3) suffered from an adverse employment decision, and (4) was replaced by someone sufficiently younger to permit a reasonable inference of age discrimination.[90] If the plaintiff establishes a *prima facie* case, the burden then shifts to the defendant to produce "a legitimate, non-discriminatory reason for the adverse employment decision."[91] If the employer makes that showing, the burden then shifts back to the plaintiff, who, to prevail, must show by a preponderance of the evidence that the defendant's non-discriminatory explanation of the

---

[88] 411 U.S. 792 (1973).
[89] *Riner v. Nat'l Cash Register*, 434 A.2d 375, 376 (Del. 1981).
[90] *Ashley v. Bayhealth Med. Ctr.*, 869 F.Supp.2d 544, 552 (D. Del. 2012).
[91] *Smith v. City of Allentown*, 589 F.3d 684, 691 (3d Cir. 2009).

employment decision was pretextual and that age was the "but-for" cause of the decision.[92]

For purposes of the pending motion for summary judgment, the parties do not dispute that Dr. Khan could present a *prima facie* case of age discrimination or that DSU could meet its burden of production under the second prong of the *McDonnell Douglas* framework. DSU contends, however, that Dr. Khan cannot meet his burden under the third prong of the framework. To defeat a motion for summary judgment aimed at the third prong of *McDonnell Douglas*, a plaintiff "must point to some evidence, direct or circumstantial, from which a fact finder reasonably could either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's actions."[93]

DSU contends Dr. Khan cannot meet this burden, arguing there is nothing in the record to dispute Provost Thompson's denial that age was a factor in his decisions to discipline Dr. Khan. DSU urges that Dr. Khan's subjective beliefs regarding the reasons for his discharge are not sufficient to overcome a motion for summary judgment.[94] At a minimum, however, Dr. Khan has put forward evidence from which a jury reasonably might conclude that DSU's stated non-

---

[92] *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994).
[93] *Id.* at 764.
[94] *See Boggerty v. Stewart*, 14 A.3d 542, 554 (Del. 2011).

discriminatory reasons for discharge cannot be believed. The shifting nature of DSU's explanations for Dr. Khan's discharge, as well as the University's admission that most of those proffered reasons were unsubstantiated or never believed by Provost Thompson in the first place, amounts to circumstantial evidence from which a jury could disbelieve DSU's proffered non-discriminatory reason for the termination.[95] Although DSU correctly points out that evidence that an employer's decision was wrong or mistaken is not sufficient evidence of pretext,[96] evidence of weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the proffered reasons is sufficient evidence of pretext to withstand a motion for summary judgment.[97] Dr. Khan's evidence moves beyond merely an incorrect decision by DSU. DSU's fluid explanations for the discipline, as well as the subsequent admission that Provost Thompson had no evidence to support at least one of the reasons he gave for discipline, are sufficient evidence from which a jury reasonably might conclude that the stated reasons for discharge were a pretext for discrimination.

Finally, as explained in greater detail in Section IV(B), below, DSU cannot at this procedural stage obtain judgment on the basis that Provost Thompson, rather

---

[95] DSU argues in reply that insubordination always was a reason for Dr. Khan's discipline, without acknowledging the other bases for discipline asserted, and later withdrawn, by DSU, particularly repeated statements that Dr. Khan intentionally sabotaged the network, statements which DSU now concedes were unsubstantiated and which Provost Thompson testified he had no evidence to support. *See* Pl.'s Resp. Br. Ex. 9 at 69 (Thompson Dep.).

[96] *See, e.g.*, *Keller v. Orix Credit All., Inc.*, 130 F.3d 1101, 1108-09 (3d Cir. 1997).

[97] *Id.*

than Dean Melikechi, made the decision to discipline Dr. Khan. Under the "Cat's Paw" theory in discrimination cases, an employer may be liable for discrimination even if the formal decision-maker did not have any discriminatory intent *if* the employee proves that "a biased subordinate, who lacks decision making power, uses the formal decision maker as a 'straw man' in a deliberate scheme to trigger a discriminatory action."[98] Dr. Khan has adduced evidence that Dean Melikechi took action to force the retirement or departure of older professors in the College, made disparaging remarks about the older professors' productivity, and actively advocated for Dr. Khan's dismissal, going so far as to suggest, without evidence, that Dr. Khan sabotaged the network. As explained below, Provost Thompson deferred to Dean Melikechi on decisions about the College and specifically solicited his input on the discharge decision. That evidence may be sufficient to impose liability on DSU, even if the formal decision-maker had no discriminatory intent.

## IV. Disputed issues of fact preclude summary judgment on Dr. Khan's tortious interference claim.

Finally, Dean Melikechi contends judgment should be entered in his favor on Dr. Khan's claim that Dean Melikechi tortiously interfered with Dr. Khan's existing and prospective business and contractual relationships with DSU by

---

[98] *Ennis v. Del. Transit Corp.*, 2015 WL 1542151, at * 2, n.10 (Del. Super. Mar. 9, 2015); s*ee also Dolan v. Penn Millers Ins. Co.*, 625 F. App'x 91, 94, n.7 (3d Cir. 2015); *Greenawalt v. Clarion Cty.*, 459 F. App'x. 165, 169 (3d Cir. 2012).

causing Dr. Khan's discharge. Dean Melikechi contends this claim fails as a matter of law because he was acting as DSU's agent or affiliate at the time of his alleged interference and because Dr. Khan cannot establish that Dean Melikechi's conduct proximately caused Dr. Khan's termination. Both arguments, although potentially meritorious, require presentation to the jury because factual disputes preclude entry of judgment at this stage.

## A. The issue of whether Dean Melikechi was acting within the scope of his employment or as an affiliate of DSU is a factual dispute.

Dean Melikechi first argues that Dr. Khan's claim against him fails as a matter of law because an agent or affiliate of a party to a contract cannot tortiously interfere with the contract. The law in this area is settled. Delaware follows the Restatement with respect to claims for tortious interference with a contract.[99] To prevail on such a claim, a plaintiff must prove five elements: (1) plaintiff was a party to a contract, (2) defendant was aware of the contract, (3) defendant's intentional act was a significant factor in causing the breach of such contract, (4) defendant's act was unjustified, and (5) defendant's act caused injury to plaintiff.[100] Because a claim for tortious interference cannot lie against a party to the contract,

---

[99] *Grunstein v. Silva*, 2009 WL 4698541, at * 16 (Del. Ch. Dec. 8, 2009).
[100] Restatement (Second) Torts § 766 (1979); *AeroGlobal Capital Mgmt. v. Cirrus Indus.*, 871 A.2d 428, 437, n. 7 (Del. 2005); *Grunstein*, 2009 WL 4698541, at * 16.

an agent to a party likewise cannot tortiously interfere with the contract, provided the agent was acting in the scope of his employment.[101]

Dean Melikechi argues that this agency principle, along with a separate but related doctrine known as the "affiliate" or "interference" privilege, precludes the claim against him. Although both defenses ultimately may defeat the tortious interference claim in this case, both require factual determinations that cannot be made in the present procedural posture. The question of whether Dean Melikechi was acting within the scope of his employment is an issue of fact for the jury.[102] Although a "very clear" case may be resolved by the court as a matter of law, this is not such a case. There are allegations, along with circumstantial evidence, that Dean Melikechi discriminated against Dr. Khan either because of his age or as a result of personal animus. There are facts to support an inference that Dean Melikechi was the source of the admittedly false statement that DSU had evidence that Dr. Khan sabotaged the CMNST Network, as well as facts to support an inference that Dean Melikechi undertook to eliminate from the College, through retirement or attrition, all the older professors and that his actions with respect to Dr. Khan were part of that effort. Although that evidence may not be sufficient to

---

[101] *Nelson v. Fleet Nat. Bank*, 949 F.Supp. 254, 262-63 (D. Del. 1996); *Shearin v. E.F. Hutton Grp., Inc.*, 652 A.2d 578, 590 (Del. Ch. 1994).

[102] *Nelson*, 949 F.Supp. at 263. Under the Restatement, conduct of a servant is within the scope of employment if "(a) it is of the kind he is employed to perform; (b) it occurs substantially within the authorized time and space limits; (c) it is actuated, at least in part, by a purpose to serve the master." Restatement (Second) Agency § 228 (1958).

prevail at trial, scope of employment is an issue of material fact that requires presentation to the jury.[103]

The issue of whether Dean Melikechi can invoke the "affiliate" privilege likewise requires resolution of disputed issues of fact. That privilege exists "where non-parties to the contract share a 'commonality of economic interests' with one of the parties and act 'in furtherance of their shared legitimate business interests.'"[104] The privilege does not attach where, as alleged here, the affiliate "was motivated by some malicious or other bad faith purpose to injure the plaintiff."[105] For the reasons set forth above regarding the factual dispute as to scope of employment, the jury must resolve the disputed facts regarding Dean Melikechi's actions and motivations before this privilege can be invoked.

**B. Proximate causation is an issue the jury must resolve.**

Finally, DSU argues that Dr. Khan cannot establish that Dean Melikechi's actions proximately caused the alleged breach of contract because it was Provost Thompson, rather than Dean Melikechi, who made the decision to discipline Dr. Khan. There are disputed issues of fact, however, regarding the extent to which Dean Melikechi attempted to influence that decision, as well as the extent to which Provost Thompson deferred to the Dean. Viewed in the light most favorable to Dr.

---

[103] *See, e.g.*, *Nelson*, 949 F.Supp. at 263-64 (holding allegations of discrimination could, but do not necessarily, support a finding that an agent was acting outside the scope of employment).
[104] *Grunstein*, 2009 WL 4698541, at *16.
[105] *Id*.

Khan, there is evidence from which a jury reasonably could conclude that the Provost did exhibit such deference and allowed Dean Melikechi to drive the decision.

For example, the Provost conceded he trusted Dean Melikechi's judgments and had a practice of keeping "College level decisions at the College level." The Provost allowed Dean Melikechi to begin searching for Dr. Khan's replacement at a time when Provost Thompson only had suspended Dr. Khan with pay, suggesting that Dean Melikechi did not intend Dr. Khan to return to the University. The Provost sought Dean Melikechi's input on the draft discharge letter and then tasked him with actually delivering that letter to Dr. Khan. Again, as set forth in Section III(B), above, Dr. Khan has adduced evidence from which a jury reasonably could conclude that Dean Melikechi undertook to force older professors to retire or otherwise leave the College by, among other things, (1) making negative statements about their relative productivity and (2) forcing them to give up research labs and equipment. Regardless of whether it is enough to prevail before a jury, that evidence is sufficient to create a disputed issue of fact precluding entry of judgment on this claim.

## CONCLUSION

For the reasons set forth above, Plaintiff's Motion for Summary Judgment as to Counts I and II is **DENIED**, while his Motion for Summary Judgment as to

Defendant Delaware State University's counterclaim is **GRANTED**.  Defendants'

Motion for Summary Judgment as to Counts III, IV, and V is **DENIED**.  The

parties **SHALL** contact chambers within one week to schedule a teleconference to

set a new trial scheduling order.

        **IT IS SO ORDERED**.


                                            */s/ Abigail M. LeGrow*
                                            **ABIGAIL M. LeGROW, JUDGE**



Original to Prothonotary
cc:    All counsel via File & Serve